(No. 6606.   February 23, 1939.)

STATE, Respondent, v. PAUL MARTIN BOYATT, Appellant.

[87 Pac. (2d) 992.]

C. V. Boyatt and Roy L. Black, for Appellant.

J. W. Taylor, Attorney General, and R. W. Beckwith, Assistant Attorney General, for Respondent.

HOLDEN, J.—Appellant was convicted of murder of the second degree, and appeals. It appears from the record appellant and Barbara Boyatt had been married about two years and for about a year and a half before the killing they lived on River Street in Hailey, Idaho. As to the character of the house in which they lived and where the killing occurred, she testified:

"Q. You have a big red sign out in front of the house called 'Bobby's Place'?

"A. Yes.

"Q. As a matter of fact, this is just a house of prostitution?

"A. I have never called it that. It is 'Bobby's Place.'

"Q. Bobby's Place?

"A. Yes, a beer parlor.

"Q. As a matter of fact that is what it is—a house of prostitution?

"A. I don't know.

"Q. You don't know?

"A. I don't know."

And appellant testified:

"Q. How did your wife make a living?

"A. By running a beer parlor.

"Q. What did she sell?

"A. Beer.

"Q. Sell any whiskey?

"A. Previously she—(objection by counsel for appellant).

"A. She sold whiskey previously to that, yes.

"Q. Have any girls in the house all the time?

"A. There were girls around there once in awhile as far as I noticed.

"Q. That was the way she made her living wasn't it?

"A. Yes, sir."

It further appears, from the record, a dance hall was also operated in connection with the beer parlor and house of prostitution.

Appellant testified the killing occurred August 12, 1937, under the following circumstances: That he called his wife by phone from Shoshone at about 4:30 in the afternoon; that he told her he would be up in a couple of hours; that she told him she didn't care whether he ever came up, and he said: "What is the matter, are you drunk again?" that on the way to Hailey from Shoshone, he stopped at Bellevue, where he drank a bottle of beer and again called the house asking for Monte Ferris; a woman answered the phone and he asked her to have Ferris come to Campbell's Drug Store at Bellevue,

and Ferris came; that he (Boyatt) left his car at Bellevue and rode on to Hailey with Ferris; he got home at about 7 o'clock entering through the kitchen door, and Slater and his wife were in the kitchen; Slater was sitting on a chair and his wife was standing by the kitchen stove; after some conversation with Slater and his wife, he inquired: "What is the matter with you?" and said to her: "Come on in the bedroom, I want to talk with you"; that she looked at Slater but did not say anything and he took her by the arm; that Slater jumped up and pushed him against the wall, saying: "Red, I am in, and you are out; you haven't any business around here any more. I have been living with your wife, and I am going to keep on living with her"; that he replied: "That is funny," and turned to her and said: "Is that right?" and she said: "Yes, that is right"; and he said: "I guess that is that"; he then called for Ferris and asked Ferris to take him to Bellevue; on the way back, Ferris told him what Boyatt testified the deceased had already told him, that is to say, the deceased had been living with his wife; upon arriving at Bellevue he borrowed a "32," and bought a box of shells; that he got the gun because he wanted a "little authority"; he might "want to run a bluff on a fellow, and I might have to hit him on the head as a little protection"; after borrowing the gun and purchasing the shells he drove back to Hailey; that he "anticipated trouble and I was trying to avoid it"; upon his return to the house he walked up the back stairs to Ferris' room and asked if "Bobbie" was still there, and Ferris told him she was; he then walked through the dance hall and barroom, and into the kitchen; he happened to look in the bedroom and saw his wife lying on the bed with Slater leaning over her, handing her a drink, and his wife said: "Hello, you back again?" Slater turned around and set the glass on the dresser; Slater had his back turned to him when he (Boyatt) said: "Get out of here, Slater, I want to talk to my wife, you are a hell of a friend"; Slater wheeled around sideways and reached under his shirt for an automatic, and Boyatt said: "Don't pull it"; Slater said: "You red-headed son of a bitch, you are the guy that is going out, not me, and you are going out right

now''; that Slater drew an automatic and started to fumble with the safety catch, and pointed the automatic right at him and there was a sort of snap; that Boyatt did not know whether it was on safety or not; that he (Boyatt) reached for his gun, but it caught on his pants pocket; the minute he grabbed for his gun, Slater ran over and grabbed his hand; he tried to hit Slater over the head; Slater was calling him a son of a bitch and saying: ''I will kill you, you son of a bitch; you get out of here and stay out''; that he tried to hit Slater over the head with his gun and the gun went off; he did not know where the bullet went; Slater was hitting him on the shoulder with his gun; he was sober and Slater was drunk; they struggled through the bedroom door, and out into the kitchen, and went into a clinch; Slater let loose of his hand and got both hands on the automatic and he then reached over and hit Slater three or four times on the head; Slater let one hand free and hit him on the nose and that temporarily dazed him and he dropped down on one knee; Slater grabbed him on the right side of his shirt collar with his left hand, and was trying to hit him on the head with an automatic, and at the same time trying to work it; Slater was cursing him, saying: ''I will kill you''; that as soon as he (Boyatt) raised up, Slater grabbed him by his hand and twisted it around, trying to make him drop the gun and that was ''when the gun went off the first time or the second time. Anyway, it went off twice right quick. We were fighting and he was cussing and finally both guns dropped on the floor, and we were both in a clinch, and we fell over here on the stove; over on this kitchen range, and were lying across that, and I was trying to hold him, and he was poking me on the side and finally reached over and got the stove poker or lifter, and hit me right along the left temple. That dazed me and I dropped to the floor and as I was groping around I got my hands on the automatic and as I raised up he had this poker ready to smack me again, and I hit him on the head with the automatic, and the magazine flew out of the gun, and we clinched and scuffled for possibly thirty seconds more, and we both fell on the floor and I pushed him away and he says: 'I got enough, I'll leave,' and I said: 'O.K.' ''; that he (Boyatt) got up and

went into the other room where his wife had a telephone receiver down and hung it up and said: "There is no use calling anybody now, I am going to take you to Pocatello"; at first she said: "No, you are not," and he said: "Yes I am," and gave her a push out in front of him; as they went out he picked up both of the guns; that he did not know but what Slater was stunned and might pick up one of them, and did not know Slater "was shot, the way he fought after the shots were fired. I did not suspicion him being hit; he did not slow up a bit"; he stopped on the way out of the house and knocked at Ferris' door and said: "You better call a doctor for that guy; I think he might be hurt"; they (Boyatt and his wife) drove to Bellevue, where she opened the car door and "started to dive right out of the car," and he reached over just in time to grab her; he tried to stop the car and hang on to her, but her dress gave way, and she fell to the ground; he got out of the car and picked her up and tried to get her back in but she started for the Rogers Club, at the same time screaming for the police, and he gave up and said: "What is the use"; he then "decided to drive down to see his brother, and see what he thought about it"; preparatory to making the drive he went to the "Ice Cave Service Station," and got some gas and maps; he was covered all over with blood, and his nose was bleeding; he got some water and a towel and washed the blood off; he then drove on about three miles out of Gooding when he "noticed a red spot light coming in the rear view mirror"; he pulled over to the side of the road; a man in a coupe pulled up in front and a motorcycle pulled up in the rear; one of the men said: "I am sorry, I am looking for a man in a gray coupe, with a 2A license; and this is black"; he (Boyatt) said to them: "This is gun-metal, what is the trouble?" and they said they had just got a phone call from Hailey that a man was shot; Boyatt said: "Was he just shot or what?" They said: "The last report was that the man was killed." He said: "Are you sure?" And one of the men replied: "Yes." He said: "If I see anything I will let you know"; he drove slowly on for two or three miles, thinking the matter over; that he thought

if that was the case, he would turn around and go back, and he drove back to Gooding and surrendered.

Barbara Boyatt testified: Slater stayed at her house steadily for the last four or five days before his death; he slept in her bed and ate his meals in her house when he was there at meal time; on the afternoon of the day Slater was killed appellant called her by phone from Shoshone and told her he was coming home; she asked him not to come; appellant accused her of being drunk, and that made her mad and she hung up; appellant came on home and entered the house through the kitchen door and Slater was sitting in the kitchen on a chair close to the stove; appellant asked her to go into the bedroom, and she looked at Slater and he frowned so she didn't go; appellant took her by the arm, and Slater interfered; Slater then pushed appellant up against the wall and said: "Wait a minute, you can't do that any more, I am living here now, you are out. You better get going"; appellant said: "Is that right?" And she said: "Yes, Bert has been living here the last few days"; appellant said: "I guess that is that"; and called Ferris and asked to be taken back to Bellevue; after appellant and Ferris had gone, Slater said: "That son of a bitch might come back. Have you a gun around here?" She said: "No, I haven't." And Slater said: "Where is the gun Red and I used to hunt rabbits with?" That she always kept it in the writing desk; Slater looked around and found it, and asked if it was loaded; that she didn't recall whether it was or not, so looked and found there were three shells in the gun; that Slater was fooling around with the gun on the bed and she talked him out of having it, saying: "Let's not have any gun play. I don't think Paul (Boyatt) will come back"; she then unloaded the gun and put it in the small table drawer, laying the shells on the dresser; she and Slater then sat around and talked for a while; during the conversation Slater said: "I am afraid that son of a bitch is going to come back," adding: "I am going to be prepared"; Slater then got up, got the gun and loaded it; she said: "There is no use in doing anything like that," and Slater said: "There is no use being unprepared either"; that Slater put the gun under his belt, under his shirt and they talked

and had a few drinks, and she laid down on the bed; Slater was leaning over her on the bed giving her a drink when she looked up and saw appellant standing in the door, the door leading from the kitchen into the bedroom; appellant was just inside the door in the bedroom; that she said: "Hello"; and Slater looked up at appellant; appellant said: "You are sure a fine friend, I turn my back and you move in with my wife. I think it is your move and you better get out and never come back." Slater didn't answer, but turned around and set the glass on the dresser; after setting the glass down, Slater whirled around and said: "You are the son of a bitch who are going out. I am living here, and you are the one who is going out and you better get out right now," and pulled a gun; appellant pulled his gun, too; that Slater had appellant's arm up with the gun in his hand and there was one shot fired at that time; that shot was fired in the bedroom; "they (Slater and appellant) battled back and forth in the doorway and finally got out in the kitchen. First Red (Boyatt) would be down, then Slater would be down. About that time the shots were fired, I recall Mr. Boyatt was down on one knee, and shortly after that I saw him hit Mr. Slater on the head, sitting on a chair here by the side of the kitchen stove. He had fallen in this chair and Mr. Boyatt hit him on the head. Mr. Slater got up and they had another struggle. Finally I saw them both fall in the kitchen. I ran and tried to call the sheriff's office. I got the receiver off the hook and called the sheriff's office, and while I was phoning I heard someone say: 'Enough,' but I don't know who it was. About that time Mr. Boyatt came in and asked me—told me to—told me not to phone anybody and he hung up the receiver. He reached down and picked up those guns on the floor of the kitchen as he went through." There was no one else around the kitchen or bedroom at that time, just appellant, Slater and herself; after the shooting, as she and appellant were going through Bellevue, she opened the door and started to jump, and appellant grabbed her by her clothes; she was going to jump anyway; appellant slowed down; that the force of her body tore her clothes; she finally got out and he went on; she went right back to the house; that she didn't

notice whether the stove lifter had any blood on it or not; the next morning she found a "32" automatic cartridge on the floor (and she produced what she said was the cartridge); she said she found it in the kitchen; that she and appellant had a joint bank account, and she had drawn all the money out of the bank on the twelfth of the month—the day of the killing.

In the case at bar, the state proved beyond any reasonable doubt appellant killed the deceased. Indeed, appellant does not seriously dispute that, but contends the killing was done in self-defense; and while appellant and Barbara Boyatt were the only witnesses, and their testimony was not contradicted by anyone, nevertheless, the jury are the sole and exclusive judges of the facts and the weight to be given their testimony. The jury may have concluded, and evidently did conclude, as well they might, that they were contradicted by the physical facts, as well as by their own account of the circumstances under which the killing was done; then too, their conduct and manner of testifying might have been such as to thoroughly discredit their story. That the story of the killing was contradicted by the physical facts, as well as by their own account, there can be no doubt. Appellant testified the deceased hit him on the shoulder seven or eight times, with an automatic; that the deceased struck him "right along the left temple" with a stove poker and that that dazed him and he dropped to the floor, and that the side of his head was swollen; that the deceased struck him on the nose and his nose bled; that deceased fought much harder after the second shot was fired (the shot that brought death to the deceased in about thirty minutes); that he and the deceased fought for a few minutes after that; that his (appellant's) shirt was all covered with blood; that he did not know whether it was his blood or Slater's, "it got on during the fight"; that he did not know the deceased had been shot and did not suspicion he was being chased by the officers. The record shows the killing occurred at about 8 o'clock, or very shortly thereafter, on the night of August 12, 1937, and that appellant was arrested a few hours later; that there were no bruises or abrasions; that there was no blood on appellant's clothing; that

he was well and neatly dressed, in fact, he was quite well-groomed. Dick Slater, a brother of deceased, testified he arrived at the scene of the shooting within a few minutes after it occurred; that his brother was bleeding at that time, and there was blood on the kitchen stove, and blood smeared and spattered all over the kitchen. Dr. Fox, called by the state, testified it would have been impossible for the deceased to have used his arm after the deceased was shot in the shoulder, for the reason that the clavicle was shattered, and the artery severed; Dr. Dice also called by the state, testified it would have been impossible for the deceased to have used his arm. And the officers who chased appellant after the killing, testified he was driving about seventy-five miles an hour. If the deceased struck appellant on the temple sufficiently hard to daze and drop him "to the floor," the side of appellant's head would necessarily have been swollen, but the officers testified it was not; and if appellant's shirt "was all covered with blood," the officers would surely have observed that, but they did not, nor is it plausible appellant, within a few hours after the killing, could have looked well groomed, and have no blood on his clothing, if he had as desperate a struggle with the deceased as he portrayed, in a kitchen all spattered and smeared with blood; and appellant could hardly have left the deceased bleeding and dying without seeing he had been shot; and driving from the scene of the murder at a speed of seventy-five miles an hour would reasonably lead an unprejudiced mind to the conclusion that appellant, to say the least, had some "suspicion" that he was being chased by the officers, and that he unquestionably knew why. Then too, appellant's testimony that the deceased fought harder after receiving the fatal wound than before, is flatly contradicted by Doctors Fox and Dice, who stated the wound was such as to make it impossible for the deceased to use his arm.

Furthermore, Barbara Boyatt testified that about the time the shots were fired, Boyatt was down on one knee, and shortly after she saw him hit "Slater on the head, sitting on a chair here by the side of the stove. He had fallen in this chair and Mr. Boyatt hit him on the head." Query: At the

time the fatal shots were fired was Slater ''sitting on a chair here by the side of the stove,'' and did Boyatt then, and after having shot him, hit Slater on the head with a gun? This much seems to be reasonably certain: Slater could not have been ''sitting on a chair here by the side of the stove,'' if the two men were, at the time, actually engaged in mortal combat. But assuming Slater was not shot while sitting in a chair by the stove, and that he fell on the chair afterward, striking him on the head with a gun after he had fallen, is a circumstance from which it might fairly be inferred appellant was bent on murder. While contradictory statements cannot be considered as independent substantive evidence, the above quoted testimony strongly supports that of the officers to the effect that she told them, shortly after the killing (which later she denied on the witness stand), appellant didn't give the deceased a chance; that he (deceased) was sitting on a chair; that the first thing they (she and Slater) knew of appellant's presence was when appellant came through the door into the kitchen and said: ''I am going to let you (meaning Slater) have it''; and that it was a ''cold-blooded murder.''

As a part of its case in chief against appellant the state proved certain admissions made by him to the officers at the time of and following his arrest, to the effect that he had had a fight; that he shot ''this man'' (meaning the deceased); that he shot him in the shoulder, and didn't think he was hurt; that appellant requested the automatic (claimed to have been used by the deceased) be wrapped carefully to preserve the fingerprints.

It is contended by appellant such evidence tends to show the killing ''was justifiable or excusable, or at most, that the crime only amounted to manslaughter,'' and that the state ''failed to rebut any of such exculpatory evidence,'' consequently the state's case was ''devoid of any of the essential elements of malice necessary to a conviction of murder ''of the second degree,'' citing and relying upon sec. 19–2012, I. C. A., and *State v. Copenbarger* (construing that section), 52 Ida. 441, 16 Pac. (2d) 383. Sec. 19–2012, *supra,* reads as follows:

"Upon a trial for murder the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof in the case tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

What this court held in the Copenbarger case was that when the killing is proved to have been committed by the defendant, and nothing further is shown, the law presumes the homicide was committed with malice and felonious intent, and consequently, the killing constitutes murder of the second degree, and that such presumption excludes murder of the first degree, in that to constitute first degree murder the killing must be premeditated, except when done in the perpetration of certain felonies (sec. 17–1103, I. C. A.). And in interpreting sec. 19–2012, *supra*, further held, if the proof on the part of the prosecution tends to show circumstances of mitigation, or justify or excuse the killing, then no burden is placed upon the defendant to make such proof; also where the state, as a part of its case in chief, makes such proof, the burden is then upon it to rebut the exculpatory evidence, but having so held, the court expressly pointed out it did not mean to hold the jury was required to believe the exculpatory evidence. Moreover, the admission made to the officers that he (appellant) had had a fight and shot the deceased in the shoulder, but didn't think he was hurt, does not tend to show the deceased was the aggressor and that appellant shot in self-defense, nor does the statement that he didn't think the deceased was hurt. In that respect, however, the record shows as a result of the shot in the shoulder, the deceased died in about thirty minutes. And appellant's request that the automatic be carefully wrapped to preserve the fingerprints would hardly tend to show, at the most, anything more than that the deceased might also have been armed, but even so, it would not follow from that circumstance the deceased was the aggressor and appellant shot in self-defense, for the reason that, insofar as that statement is concerned, the deceased could have been defending himself against an attack by appellant, and, after all, it was a matter for the jury to determine.

■■■ On cross-examination appellant was asked certain impeaching questions, for instance, as to whether he had stated in a conversation in the sheriff's office ''that Slater did not move, but reached for a gun, you said he had in his belt, and you told him to stay where he was and you said he walked toward you; that he pulled the gun and you told him not to come any closer, and you started shooting and shot four or five times; did you tell them (referring to certain officers) that?'' It is contended the trial court erred in permitting the impeaching questions to be asked, in that the statements embodied in the impeaching question, were not inconsistent with the testimony he had already given and, further, that the statements were immaterial. The impeaching questions to which objection is now made were not objected to in the trial court, nor did appellant object to certain impeaching questions also asked Barbara Boyatt on cross-examination, but to which objection is now made for the first time. Where, as here, no objection is made in the lower court, and, consequently, no adverse ruling, there is no error. (*State v. Davis,* 57 Ida. 413, 65 Pac. (2d) 1385.) A few of the impeaching questions were not followed with impeaching evidence. The asking of some of these questions is assigned as error. But, again, it appears appellant made no objection in the trial court to the asking of the particular questions now complained of, nor to the failure of the state to adduce impeaching evidence of the statements embodied in such questions. Therefore, under the rule held in the Davis case, *supra,* there was no error. Nevertheless, and as this court said in the Copenbarger case, *supra,* that practice is unfair to a defendant and ought not to be indulged in under any circumstances.

■■ In the course of the offering of rebutting testimony by the state, objections were made by appellant to certain questions asked by the prosecuting attorney. Numerous questions were asked and many objections made. Time and space will not permit a discussion of each of the objections. While the phraseology of the objections vary, they are, in substance, to the effect a proper foundation was not laid in that a different time, place, and persons present were fixed by the prosecuting attorney in his questions on rebuttal than that fixed

in his questions to the witness whose testimony it was sought to rebut, and that the questions called for a conclusion of the witness. The following questions will serve as examples: "Q. About the same time, Mr. Slater, in your presence, in the presence of Mr. Cox and Dave Howes, at about nine P. M. in the house of Bobby Boyatt on River Street in Hailey, Idaho, did Bobby Boyatt make this statement: 'If you don't go get the son of a bitch, I will. This is a cold-blooded murder. He came in through the door into the kitchen and Bert was sitting on the chair, and he said: 'I am going to let you have it.' I tried to give Bert a gun and he wouldn't take it?' "

The question asked Barbara Boyatt about which Richard Slater was interrogated, follows:

"Q. Did you on that same evening of August 12th, 1937, about nine P. M. in your house on River Street, in connection with this shooting say to Dave Howes, in the presence of Dick Slater and Mr. Beck and Mr. Cox: 'If you don't go get the son of a bitch, I will. This is a cold-blooded murder. He came in through the door into the kitchen and Bert was sitting on the chair, and he said: 'I am going to let you have it'; I tried to give Bert a gun and he wouldn't take it, did you say that?' "

It is apparent there is no merit in appellant's contention. The record discloses the prosecuting attorney adopted the practice of asking an impeaching question fixing the time, place, and persons present, but which did not include all of the inconsistent statements allegedly made by the witness during the conversation being inquired about, and then followed with other questions very clearly and evidently inquiring about further statements assumed to have been made during the same conversation, without again expressly naming all the persons present, and again fixing the time and place. Of course, there must be a substantial compliance with the statute (sec. 16–1210, I. C. A.), but it must not be given a construction which would have the effect of devitalizing it. This court, in *State v. Brassfield,* 40 Ida. 203, 209, 232 Pac. 1, approved the rule:

"The essential matter, however, is that the witness shall not be misled; and where it is plain that the attention of the witness was directed to the identical occasion or conversation brought out by the impeaching testimony, this is sufficient; and it is immaterial that the question put to the witness does not designate exactly or varies slightly from the impeaching evidence as to the time or place at which, or the name of the person to whom, the statement was made, or the exact words used in the former statement, or even fails to designate the persons to whom or in whose presence the statement was made."

■■ Appellant contends the jury should have been instructed that evidence admitted for the purpose of impeaching a witness is not and cannot be considered as independent substantive evidence. If requested, appellant would have been entitled to such an instruction (*Bodenhamer v. Pacific Fruit & Produce Co.*, 50 Ida. 248, 257, 295 Pac. 243; *State v. Bush*, 50 Ida. 166, 295 Pac. 432), but he did not request it; and appellant insists he was "entitled to an instruction that he has the right to bear arms for his security and defense," citing *State v. Woodward*, 58 Ida. 385, 74 Pac. (2d) 92, 114 A. L. R. 627. In the Woodward case it appears the trial court gave, at Woodward's request, the following instruction:

"You are instructed that the defendant, under the Constitution of Idaho, was entitled to keep and bear fire arms for his security and defense," and then added the following: "The legislature, however, has the power to regulate the exercise of this right, and this you may consider in connection with the other instructions given you herewith."

Woodward contended the above-quoted modification confused and misled the jury and had the effect of impairing his constitutional right, in "that the court at no time told the jury wherein or whereby or in what manner the legislature had regulated this constitutional right, guaranteed to the defendant to bear arms for his security and defense." This court, in passing upon that contention, said: "There is merit to the appellant's contention, especially in view of the fact that the court told the jury that they might, in considering

the right of defendant to bear arms, also take into consideration the power of the legislature to regulate the exercise of this right, thereby implying that the legislature had in some way regulated the exercise of this right and, on the other hand, left the jury to speculate as to the extent or nature of such regulations. The jury might well have thought that this instruction signified that appellant had no right to have the gun in his possession at the time this trouble arose.''

In the case at bar, the court gave the instructions requested by appellant on the law of self-defense, either identically or substantially. Appellant did not request an instruction to the effect that ''under the constitution of Idaho he was entitled to bear fire arms for his security and defense.'' If he had, and the trial court had given the instruction, and then modified it in such a manner as to confuse and mislead the jury, it would have constituted error, but, as pointed out, that is not the case.

It is further contended the prosecuting attorney committed prejudicial error on the cross-examination of appellant and Barbara Boyatt by injecting into the case certain allegedly immaterial incidents for the purpose, it is argued, of prejudicing the jury against appellant. For instance, on the cross-examination of appellant, the prosecuting attorney asked him: ''Had you been using dope?'' And upon the cross-examination of Barbara Boyatt, she was asked, in inquiring about a swimming party: ''Did you go in in the nude?''

Our attention is directed to *State v. Irwin,* 9 Ida. 35, 71 Pac. 608, 60 L. R. A. 716, *State v. Givens,* 28 Ida. 253, 152 Pac. 1054, *State v. Douglass,* 35 Ida. 140, 208 Pac. 236, and *State v. Copenbarger, supra.* In the Irwin case, approved in the Givens, Douglass and Copenbarger cases, this court said:

''It is the duty of the prosecutor to see that a defendant has a fair trial, and that nothing but competent evidence is submitted to the jury, and above all things he should guard against anything that would prejudice the minds of jurors, and tend to hinder them from considering only the evidence introduced. . . . . . He should never seek by any artifice to warp the minds of the jurors by inferences and insinuations.''

But appellant did not object to the questions he now assigns as error. As this court held in *Bodenhamer v. Pacific Fruit Company,* and *State v. Bush, supra,* there must first be an objection and an adverse ruling in the trial court. Other errors are assigned which we do not deem it necessary to discuss.

We have examined the record with the greatest care, as well as the instructions given by the court and those requested by appellant and refused, but find no error was committed necessitating a reversal of the judgment of conviction and the granting of a new trial. However, and inasmuch· as the jury recommended leniency, we have concluded the minimum of the sentence of the trial court should be reduced. Therefore, the court is hereby directed to reduce the minimum from twenty to ten years, and as so modified the judgment is *affirmed.*

Ailshie, C. J., and Budge, Givens, JJ., concur.

MORGAN, J.—The judge who presided at the trial of this case, who listened to the testimony and observed the demeanor of those who testified, was in better position than we are to fix the penalty which should be pronounced as the judgment of the court against appellant on his conviction of second degree murder. The judgment pronounced is not the extreme penalty which the law provides for that crime and, if it had been, the fact that the jury recommended leniency would not invalidate it, because the responsibility for fixing the penalty, within the terms of the statute, is that of the presiding judge —not of the jury. I dissent from that portion of the foregoing opinion and decision which directed a modification of the judgment.