**BRADLEY MIN. CO. v. BOICE.**

No. 12684.

United States Court of Appeals Ninth Circuit.

Dec. 5, 1951.

Rehearing Denied Jan. 23, 1952.
Writ of Certiorari Denied May 5, 1952.

John Parks Davis, San Francisco, Cal.,
Oscar W. Worthwine and Ralph R. Bre-
shears, Boise, Idaho, George Donart, Wei-

ser, Idaho, and Arthur B. Dunne, San Francisco, Cal., for appellant.

Jess B. Hawley, Jr., W. H. Langroise, and W. E. Sullivan, Boise, Idaho, for appellee.

Before HEALY, BONE, and POPE, Circuit Judges.

HEALY, Circuit Judge.

This appeal is from a judgment against appellant in the amount of $60,000 in a suit claiming damages for slander and false imprisonment.

Much of appellant's argument here has been given over to factual contentions. The district judge in an opinion denying a motion for a new trial outlined the testimony supporting the verdict, 92 F.Supp. 750, and there is no occasion for our going over the same ground. All that need be said is that the evidence was such as to make the question of liability one for the determination of the jury. But appellant argues that in the form returned the verdict must be taken as a finding against appellee on all essential facts. Before turning to other points we will notice this claim.

In addition to the corporate appellant, its executive vice president, John Bradley, was made a defendant in the case. Bradley was personally in charge of all the Company activities giving rise to this suit. The verdict returned was against the Bradley Mining Company alone. It made no mention of John Bradley, either one way or the other. In this posture of affairs the court inquired of counsel whether they desired the jury to be returned to their room to clear up their verdict as regards Bradley. Both sides replied in the negative.

■■ Counsel's point here is that the case was decided by the jury in favor of the defendant Bradley, hence all questions of fact which were touched by his activities have been determined against appellee. No Idaho authority is cited in support of the argument, nor are there any citations of analogous decisions from other jurisdictions. Appellee calls attention to the California case of Lloyd v. Boulevard Express reported in 79 Cal.App. 406, 249 P. 837. The situation there was in principle on all fours with the present. The corporate defendant was held liable by the jury but no verdict was returned against its active and responsible agent, Mitchell, who was also a defendant. The court remarked, 249 P. at page 838 that "the jury did not find either for or against Mitchell. It is the settled law in this state that the verdict of a jury against one of two defendants is not a verdict in favor of the other defendant. Such a verdict indicates simply that the jury failed to find upon the issues." The court added that since the corporate defendant noticed the omission and did not ask that the jury be required to find on the issue, it could not now be heard to complain. The California rule would probably be followed in Idaho.

■ Appellant's principal argument aside from an appeal to the evidence appears to be that the verdict was excessive and was arrived at as the result of passion and prejudice. There was enough evidence, certainly, if believed, to warrant the imposition of general damages in more than a nominal sum, both on the issue of false imprisonment and on the slander issue. Appellee produced testimony that armed guards were for a number of hours placed about his apartment with the view of circumscribing his movements. Consult in this connection Griffin v. Clark, 55 Idaho 364, 42 P.2d 297. Charges of insanity and of the performance by appellee of an illegal abortion—charges obviously slanderous per se—were testified to have been made in the presence of members of the general public under circumstances which the jury might properly have found rendered them unprivileged. Too, the jury might fairly have inferred from the record that appellant acted with actual malice, both in respect of appellee's imprisonment and in respect of the slanderous statements of its representatives. Concededly, under the local rule, the existence of malice in fact in a case like this warrants the imposition of punitive damages.

Apart from the mere size of the verdict, the claim of passion and prejudice is predicated on questions put to several of appellant's witnesses in the course of cross examination. These questions consist

mainly of inquiries whether the witness under interrogation had or had not made a certain statement tending to impeach his testimony.[1] In each instance the witness denied having made the statement. The complaint is that the impeaching questions were not attempted to be followed up by evidence that the witness had in fact made the statement. One need not approve tactics of this sort in order to reject appellant's argument. We think that jurors are not so easily misled. They may safely be assumed to have intelligence enough to know that if a party has evidence tending to impeach an adverse witness he will produce it. In sum, the instances of claimed misconduct cited are not thought to have had a substantial tendency to inflame the jury. The cause was submitted to them under elaborate instructions carefully defining the applicable law in terms as favorable to appellant as it could reasonably have asked. There were no objections to the charge on appellant's part.

The power of this court in respect of verdicts claimed to be excessive is not coextensive with that of the district court. At most we may consider only whether the verdict is grossly excessive or "monstrous." Southern Pacific Company v. Guthrie, 9 Cir., 186 F.2d 926, 931–933. When the trial judge is presented, as the judge was here, with a motion for a new trial grounded on a claim of excessive verdict, his power to deal with such a claim is not limited as ours is to questions of law. He may set aside a verdict when he thinks it is against the weight of the evidence or for other reasons he deems sufficient. In this instance the judge, familiar with the atmosphere of the trial and sensible of imponderables which might prejudicially affect the action of the jury, was satisfied that their verdict was motivated by the evidence alone and that it was not excessive. On the record before us, certainly, we can not say that he was wrong.

Counsel argue that the court prejudiced their case by criticizing a hypothetical question propounded to medical witnesses whose opinion was sought as to whether appellee had practiced medicine in accordance with standards obtaining in Idaho. The hypothetical inquiry was unusually lengthy. The court in the presence of the jury expressed the belief that it included a number of matters that could be of no aid to the witnesses in forming an opinion. Counsel now say that the court's remarks "not only destroyed the value of the expert medical testimony given in response to the hypothetical question, but also discredited the supporting testimony which practically constituted appellant's entire defense." Yet counsel made no such suggestion at the time or indeed at any time while the case was before the district court. They did not ask that a mistrial be declared, nor did they subsequently advance the remarks of the court as a ground for granting their motion for a new trial. We have nevertheless studied the hypothetical question and considered the judge's comments concerning it. The comments, we think, were not unwarranted. The question propounded appears argumentative, and it included, as the court observed, a number of matters that could not conceivably be of aid to a medical man in forming an opinion on the subject inquired about. Moreover the judge instructed the jury to disregard his remarks.

One other point will be noticed briefly. Appellant is a California corporation doing business in Idaho, and its co-defendant, Bradley, is a resident of California. The complaint alleged and the answer denied that plaintiff is a citizen and resident of Idaho. It is argued that no proof whatever was offered as to his being a citizen of that state or any other state, hence the requisite diversity was not shown.

[1] In one instance it is claimed that counsel attempted to inject a religious issue in the course of cross examination. We have considered this incident and regard it as of no more than trifling consequence. In any event it was not objected to at the time.

There was no proof directed immediately to the issue, but we think it sufficiently appears from the record as a whole that appellee was domiciled either in Idaho or in Texas.[2] The evidence is that he was raised in the latter state and after schooling was admitted to practice medicine there. During the second world war he entered the armed services and was discharged in October 1946, after which he sought a location in the northwest. In January of 1947 he entered into a contract of indefinite duration with appellant to take charge of the latter's hospital at Stibnite, Idaho. Following the making of this arrangement he returned to Texas to get his wife and children and to await the effective date of his employment, which was to be March 1, 1947. At that time he removed to Stibnite with his family and possessions, and resided there until May 15, 1948, when his contract was terminated by the company. At the inception of this employment he had applied for a license to practice medicine in Idaho and later was licensed by the state as a physician and surgeon. It casually appears from various items of evidence in the record that following his discharge at Stibnite he resided in Boise, where he was living at the time this case was filed and thereafter. Proof of residency in a state is usually thought prima facie evidence of domicile sufficient to shift the burden of proof. Cf. Kelleam v. Maryland Casualty Co., 10 Cir., 112 F. 2d 940; Sherman v. Roosevelt Co., D.C., 48 F.Supp. 434; Tudor v. Leslie, D.C., 35 F.Supp. 969.

Affirmed.

POPE, Circuit Judge (dissenting).

The circumstances which gave rise to this action took place in connection with the termination of the employment of the appellee, a physician and surgeon, who had been employed by the Bradley Mining Company. The Mining Company operated mines at Stibnite, a remote mining town located in the mountains of Idaho. It had a contract with its employees under which it arranged to provide hospital and medical care not only in cases arising out of industrial accidents, but in all cases of illness of the employees or any members of their families. To accomplish this it had established and equipped a hospital, and Dr. Boice, the appellee, had been employed to manage the hospital and to provide the medical and surgical care required. The appellee was the only physician in the community.

The work in the hospital was handled by a number of nurses, selected by the doctor, but paid by the Mining Company, and there were generally at least two who were graduate registered nurses. Dr. Boice and his family were furnished an apartment which was directly connected with the hospital.

At the time of the trial all of the graduate registered nurses, who had been employed in the hospital during Dr. Boice's management, testified. At that time none of them was any longer employed by or connected with the hospital or the Mining Company. Their testimony was all to the effect that it was exceedingly difficult to get the doctor to see patients who came to the hospital for advice or treatment; that on many occasions he refused to see or interview such patients; that on occasions employees injured in serious industrial accidents were brought to the hospital and the doctor refused to go near them for the period of several days; that he did not make regular rounds of the hospital to inspect those hospitalized there; that he insisted in giving oral directions for treatment and medication to the practical nurses and generally declined to give such instructions either to the head nurse or other graduate registered nurses in writing or by entries on the charts; that while he thus absented himself from the hospital he remained in his apartment and refused to see patients even when the nurses sought him out and requested his presence. During such times his wife, who was neither an employee nor a physician, made the hospital rounds in her husband's stead and

2. The whole record may be looked to on this subject. Sun Printing & Publishing Ass'n v. Edwards, 194 U.S. 377, 24 S.Ct. 696, 48 L.Ed. 1027. There was enough proof, we think, to satisfy the jurisdictional requirement.

undertook to give orders for treatment of the patients. The nurses testified as to how the doctor would schedule operations for morning hours, and then, after the patient had been prepared and wheeled into the operating room at the appointed time, the doctor would not appear until long after noon, and sometimes not at all on the appointed day.

The nurses testified that when it was necessary to procure directions from the doctor, they would proceed to the apartment in order to talk to him and that frequently the doctor was in the bathroom with the door closed, where he remained for long periods of time, and that they had to consult with him through the closed bathroom door. The nurses complained to Dr. Boice about the difficulty of procuring proper directions and about his refusal to see inmates and callers at the hospital but the situation did not improve. At times when the doctor was in the hospital and he was approached by a nurse in order to have him interview a patient, he climbed out of the window to get away from the nurse and avoid the interview. Some of the nurses furnished additional details, such as the doctor's permitting his children, his dog, and his pet ducks to wander about the hospital.

Finally, some of the nurses reported the unsatisfactory condition to the Mining Company officers stating they proposed to resign. They were requested to stay until some replacement could be found for Dr. Boice. The contract of employment provided for termination of his two year term at any time on 60 days notice, and on April, 1948, he was given such notice.

Early in the following month he performed an operation said by him to be exploratory in character upon a woman who he said was suspected of having malignant cancer or tumor of the uterus. One of the nurses protested before the operation that the woman appeared to be pregnant, but the doctor, without making any tests for pregnancy, nevertheless proceeded with the operation. He performed a hysterectomy and removed the uterus which was found to contain a fetus which moved and kicked. The doctor admitted that he had not known that the pregnancy existed when the operation was performed, and the only point in controversy with respect to this operation was as to whether it was a six month or only a three month old fetus. The graduate registered nurses who were present and who saw the fetus and who had some years of training and experience in obstetrical techniques, testified that it was apparently a six-month fetus. The doctor proceeded immediately to dissect the uterus. The nurses were present as was a four year old child of the doctor during this procedure. Immediately thereafter the specimen disappeared and although in a short while much controversy arose about the operation, the specimen was not exhibited to any other person. The doctor admitted that he kept it in alcohol until after he left Stibnite, and that he buried it in the vicinity of a ranch where he stopped on his way out following his discharge.

The head nurse testified that another patient in apparently the same condition as the woman thus operated upon was then in the hospital awaiting a similar operation. The nurse became much agitated about the incident just described and she went to the officials of the company advising them that in her opinion some "mad surgery" was going on; that the Mining Company was likely to be held responsible for some of the consequences and that the doctor should be removed from his responsibilities at once.

It was following this report that the company officers called the Idaho Department of Public Health which immediately sent a representative of the department and a physician member of the Hospital Advisory Board to Stibnite. The company officials then approached Dr. Boice, and in the presence of these persons demanded that he quit his employment and that he leave town at once.[1] It was in the course of the ensuing argument with Dr. Boice

1. Stibnite was a "company town" in the sense that substantially all of its inhabitants were company employees and their families, and substantially all of the houses and buildings were company owned.

that the company officers are said to have expressed the opinion that the doctor was mentally ill and insane and to have stated he had performed an illegal operation.

The charge of slander arises out of these remarks. At first the doctor declined to accede to any termination of his employment and stated that he proposed to continue. It was then that a guard was stationed at the door leading from the apartment to the hospital to keep the doctor from entering the hospital. It was claimed that at the same time guards were placed near other outside doors of the apartment to prevent the doctor from leaving the apartment at all. The doctor himself testified that there were guards on those other sides of the apartment, but his wife gave no such testimony and other persons who were there saw no guards other than the one at the entrance of the hospital.

The charge of false imprisonment is predicated upon this claim that the apartment was surrounded by guards, and that when Dr. Boice and his family drove out of town the following Sunday night, an employee of the company followed to make sure that they did leave. It is not claimed that the imprisonment lasted more than a few hours, for during the evening following the time mentioned the doctor and his wife left the apartment and went about the town without any difficulty or interference. After some argument which followed the demand for Dr. Boice's immediate departure, he was finally paid compensation for a sixty day period which included compensation for the loss of the use of the apartment, and the doctor and his wife took their belongings and left Stibnite.

I have no difficulty in going along with the majority and with the trial judge upon the proposition that there was some evidence to prove an imprisonment [2] and that the defamatory remarks made in the presence of the Health Department representatives could be said to have been made before persons with respect to whom the rule of privilege would not operate.

But, with respect to the amount of damages, the Mining Company had the right, under the Idaho statute, to show the matters testified to by the nurses by way of mitigation.[3] What impresses me is that the testimony of these four graduate registered nurses was not impeached in any manner. They were wholly disinterested when they testified, none of them is shown to have had any motive to misrepresent, and what is more, their testimony was not even denied. Under these circumstances, I think the court was obliged to assume that their testimony was true and, if it was true, there was assuredly something gravely wrong about the conduct of the appellee doctor in and about the performance of his duties.

I think also it cannot be questioned but that when these matters were called to the attention of the Mining Company, its officers were justly and reasonably alarmed about the situation in view of the company's responsibility under its hospital management. The company officers would properly assume that the training in discipline of a graduate nurse is such that she would not be likely to question a doctor's actions unless his conduct had become actually shocking.

The testimony of these nurses did not stand alone. It was corroborated by the testimony of several of the practical nurses, and the doctor's inattention to his work and many of the inexplicable aspects of his often erratic and eccentric conduct and demeanor were testified to by many former inmates of the hospital. Many of these patients were at the time of the trial either company employees or members of their families, but it is noteworthy that in general the circumstances related by them

---

2. The evidence of imprisonment was exceedingly flimsy. I do not think there was any, but of course I am not a fact finder here.

3. "In the actions mentioned in the last section, the defendant may in his answer, allege both the truth of the matter charged as defamatory, and any mitigating circumstances to reduce the amount of damages; and whether he prove the justification or not, he may give in evidence the mitigating circumstances." Sec. 5–811, Idaho Code.

were not denied. The doctor himself was not called upon rebuttal after all this testimony had been adduced.

I would be inclined, without more, to say that the verdict of $60,000 under the circumstances of this case is grossly excessive and monstrous. As I read the testimony I think it is apparent that when Dr. Boice was told to leave, the officials of the company who talked to him were not only alarmed but had become so excited that under the circumstances their method of approaching the doctor and demanding his departure was more abrupt and undiplomatic than it needed to be. I think that the only circumstances from which malice could be inferred in order to support an award of punitive damages is this unnecessarily harsh method of putting pressure upon him to leave, but I assume that there was sufficient evidence of malice to sustain an award of punitive damages, although the inference of lack of malice, I believe, is the stronger. Even assuming a permissible inference of malice, I think the award a monstrous one, wholly apart from the circumstances which I am about to mention.

In my opinion the record is so filled with matters improperly injected on behalf of appellee as to demonstrate what I can only conclude were deliberate efforts to make appeals to the passion and prejudice of the jury. One of these instances is mentioned in the opinion of the majority, who apparently treated it as an isolated instance, of trifling consequence. I do not so read the record.

For instance, appellee's counsel no doubt felt that they should in some manner undertake to break down the effect of the testimony of the nurses to which I have referred. They proceeded to do this by propounding to each of them certain questions, which, if answered in the affirmative, would

have disclosed that the nurse in question was very biased against the doctor, or had made prior statements contradictory of her present testimony. Thus Miss Morton, the nurse who had reported the operation to the company officials, was asked: "Miss Morton, immediately after your arrival on the 29th of April or the next day, or within a day or two, you started to criticize Dr. Boice to other nurses, did you not?" She was also asked: "Were you not also talking to the patients and criticizing the doctor's treatment of the patients?" Both of these questions were answered "No, sir", and in answer to the second, the witness said "I used all the excuses I could manage to cover up for Dr. Boice not seeing his patients". Now, if counsel was possessed of any evidence of any such conduct on the part of Miss Morton as that suggested by the question, which would have tended to show substantial bias on her part, proof of that fact would have been admissible. Collenger v. United States, 7 Cir., 50 F.2d 345; United States v. Beekman, 2 Cir., 155 F.2d 580; 3 Wigmore Evidence (Third Edition) § 1022. But no such testimony was adduced.

If only those two questions were involved, it is clear that their asking would be entirely proper, whether followed by other proof or not. I think it would be taken that counsel would be presumed to have asked them in good faith.

The record here, however, shows a pattern of similar inquiries so repetitive, and so completely unsupported by any attempt to establish the suggested impeachment otherwise than by the mere asking of the questions, that the only fair conclusion, I think, is that they show a deliberate effort to inject, not by proof, but merely by innuendo, matters calculated to give rise to passion and prejudice on the part of the jury.[4]

---

4. Thus, still proceeding with the cross-examination of Miss Morton, she was asked: "Didn't you tell Mr. Provost [a hospital patient] that he should sue the doctor for malpractice?" Also, she was asked: "When the doctor asked you to leave didn't you tell him at that time that you were not working for him, and that he could not fire you, that you were working for Mr. Bailey?" Also: "Did

you tell Helen Christensen that you were not employed by Dr. Boice but were employed by Mr. Bailey?" In each case the answer was in the negative. Some of the suggestions in these questions to Miss Morton were repeated in questions to other nurses. Mrs. Anaruk (formerly Miss Haskins) was asked: " * * * Were you ever present, during your period at the Stibnite Hospital, when Miss

The cross-examination of the other nurses followed the same pattern.[5] It was extended to other witnesses. A guard stationed at the hospital door was asked about a conversation with a Mr. and Mrs. Ross. He was then asked: "Do you remember on that occasion that you said Doc had gone crazy, and that you had instructions to keep him under guard, and that you had instructions to shoot him down like a dog if he got funny?" Martin, the county attorney, was asked on cross-examination if he did not state to Dr. and Mrs. Boice that "it was silly for them to fight Mr. Bradley and his money."

These instances will serve to illustrate the method of cross-examination adopted by the doctor's counsel. Many other similar instances are listed and complained of by appellant. In no instance was any effort made to prove, by calling any other witness, that the suggested prior contradictory statement, or statement disclosing bias, had actually been made. The conclusion seems unavoidable that such questions were not asked in good faith, or in the belief that they referred to any actual occurrence, or that any such statements had actually been made, but rather that they were asked in a studied attempt to prejudice the jury by the innuendo which was certain to be the effect of the mere interrogation. As the Supreme Court of Montana said of a somewhat similar procedure, "Manifestly it was the questions and not the answers which counsel considered important." State v. Patton, 102 Mont. 51, 59, 55 P.2d 1290, 1292, 104 A.L.R. 76. Cf. United States v. Nettl, 3 Cir., 121 F.2d 927.

When the evidence came to a close and it then became apparent that appellee did not intend to produce witnesses to prove the statements thus insinuated in the questions, appellant might well have moved the court to direct the jury to disregard the questions. The Idaho court has held that without such a motion, the asking of the questions, or the failure of the court so to instruct, is not ground for a reversal,[6] although that court has labeled such a procedure as that indulged in by appellee's counsel here, as "unfair to a defendant", a practice which "ought not to be indulged in under any circumstances", State v. Boyatt, 59 Idaho 771, 784, 87 P.2d 992, 998, and as a "reprehensible practice", State v. Flitton, 52 Idaho 374, 379, 15 P.2d 397.[7]

Jeanne Morton made statements to Mr. Provost criticising Dr. Boice when Dr. Boice was not present?" The same witness was asked if Miss Morton had not told her she was hired "for the purpose of constantly checking on Dr. Boice and reporting back to [company officers]". Mrs. Richardson was asked: "Do you know whether or not Miss Morton, during that entire period, was extremely critical of Dr. Boice to you and the practical nurses and also the patients involved?"

5. Nurse Anaruk was twice asked whether she had not, shortly after Dr. Boice left, stated to one Faye Anderson, that she "had never seen anything like the treatment accorded Dr. Boice by the Bradley Mining Company or their agents", and that she was going to quit because she "did not like the way they treated Dr. Boice". Nurse Lee was asked if she, about that time, did not go to Dr. Boice to express her sympathy, and did not then say "he was the best surgeon [she] had ever known". Nurse Kirshner was asked if she had not made two purported statements. If these statements had been made they would have indicated that this nurse told a Mr. Sims, while he was in severe pain, to get up and get out of the hospital, and that she made a similar statement to a Mrs. Baker, hospitalized for hypertension. The same nurse was asked if there was not friction between herself and the head nurse, Mrs. Johnson. Nurse Johnson was asked if she had not said of Nurse Kirshner that the latter "was in disgrace in the nursing profession".

6. But as to whether, at such a late hour in the trial, the effect of the questions could be removed by an admonition, see United States v. Grayson, 2 Cir., 166 F. 2d 863, 871; Waldron v. Waldron, 156 U.S. 361, 383, 15 S.Ct. 383, 39 L.Ed. 453.

7. In a lengthy effort to justify his procedure, appellee cites decisions to the effect that the purpose of cross-examination is to show bias, to show previous contradictory statements, to place the witness in his proper setting, to modify or explain the testimony, etc. It is claimed that the cross-examination here was to show these things. The fallacy of

But as I read this record, I think it immaterial whether appellant, by not making such a motion, lost the right to demand a new trial for misconduct of counsel as such. The important fact is that this highly prejudicial matter was improperly before a jury which has produced a very large verdict. It serves to account for the size of the verdict. It is all of the same stripe as the conduct of appellee's counsel in having a witness relate, without any showing that it related to this case, a purported conversation between two of appellant's officers in which one asked "Do you think his word would stand up?" And the other replied, "No, he is just a common laborer". In like manner, a witness was asked if she knew that when the Boices left, Mrs. Boice was pregnant. No one testified to such a pregnancy. I cannot escape the conclusion that this question, and the conversation about "just a common laborer", and the question about a company official rejecting a proposed employee because she was Jewish, were all dragged in merely for their likelihood to cite passion and prejudice.

A jury cannot be expected to make a calm, judicious and fair appraisal of damages in such an atmosphere. It is apparent that this one did not. Where an excessive verdict thus results from passion and prejudice, the error cannot be cured by remittitur. A new trial must be granted, for the means employed at the trial "may be quite as effective to beget a wholly wrong

verdict as to produce an excessive one." Minneapolis, etc., Ry. v. Moquin, 283 U.S. 520, 51 S.Ct. 501, 502, 75 L.Ed. 1243.[8]

In my opinion a very thin case has here been whipped into a monstrosity. I think a new trial should be ordered.

---

that argument here is that none of those things were shown. They were only insinuated.

8. I think, also, there is a nice question whether the trial judge did not erroneously refuse to exercise his discretion to grant a new trial, because he mistook his power to do so in a case where the verdict is against the weight of the evidence. In his opinion denying a new trial, after referring to the Constitutional right of trial by jury, he said: "If this mandate is to be obeyed the Court must proceed with caution when a motion such as is now before this Court is considered, with the thought in mind that if the Court is going to set aside the verdict for no reason except that the Court feels it is excessive, this constitutional provision will be violated and a jury trial would be a useless thing if in the final outcome

the Court could supplant its opinion in place of the opinion of the jury." 92 F. Supp. at page 755. This sounds like the statement of the trial court which led to reversal in Felton v. Spiro, 6 Cir., 78 F. 576, which was cited with approval in Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 481, 53 S.Ct. 252, 77 L.Ed. 439. The Constitutional right to trial by jury, mentioned by the trial judge, includes the right to a trial under the direction of a judge empowered to grant a new trial when he believes the verdict is against the weight of the evidence. Capital Traction Co. v. Hof, 174 U.S. 1, 13, 19 S.Ct. 580, 43 L. Ed. 873. This is "one of the historic safeguards of that right." Aetna Casualty & Surety Co. v. Yeatts, 4 Cir., 122 F.2d 350, 352, 353. Cf. Southern Pac. Co. v. Guthrie, 9 Cir., 186 F.2d 926, 932.