814 P.2d 401

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Jeremy D. BROADHEAD,
Defendant–Appellant.**

No. 18414.

Supreme Court of Idaho,
Boise, February 1991 Term.

May 30, 1991.

Rehearing Denied Aug. 27, 1991.

Penland & Munther, Boise, for defendant-appellant. Michael J. Flanagan argued.

Larry J. EchoHawk, Atty. Gen., Michael J. Kane, Deputy Atty. Gen., Boise, for plaintiff-respondent. Michael J. Kane argued.

JOHNSON, Justice.

This is a criminal sentencing case. The appeal challenges a life sentence, with the first fifteen years fixed and the balance indeterminate. This sentence was given to a fourteen-year-old boy who pled guilty to the second-degree murder of his father.

We hold that the sentence is not unreasonable under our existing standards for reviewing sentences on appeal. We decline the invitation to develop a modified standard for reviewing the sentence of a child under the age of sixteen who is sentenced for murder as an adult. We also hold that the sentence is not cruel and unusual punishment under either art. 1, § 6 of the Idaho Constitution or the eighth amendment to the Constitution of the United States.

## I.

## THE BACKGROUND AND PRIOR PROCEEDINGS.

Jeremy Broadhead was fourteen years old when he shot and killed his father. Pursuant to the automatic waiver provision of our Youth Rehabilitation Act (I.C. § 16–1806A(1)(a)), Jeremy was charged as an adult with the crime of first-degree murder. Several months later, Jeremy pled guilty to an amended charge of second-degree murder. After receiving a presentence investigation report, the trial court conducted a sentencing hearing.

The evidence presented at the sentencing hearing indicated that Jeremy's parents were divorced when Jeremy was seven years old. Jeremy lived with his mother in eastern Idaho until he was thirteen, when he began living with his father in southwestern Idaho. Jeremy was an average student and an excellent athlete. He had no prior arrest record, although he had taken his father's pickup truck without permission a few months before the murder and had driven to southeastern Idaho.

While he was living with his father, Jeremy and his father had some disputes concerning his performance at school and his social activities. His father grounded Jeremy for some periods and restricted his use of the telephone. During the days prior to the murder, Jeremy considered shooting his father and discussed this with his friends. After the murder, Jeremy informed some of his friends what he had done and showed them his father's body. Jeremy then took his father's credit cards, some money, and his father's pickup, before spending the night with a friend.

Prior to sentencing Jeremy, the trial court considered the presentence report and the testimony of several experts who described Jeremy's psychological circumstances before and after the murder. In sentencing Jeremy, the trial court specifically considered that Jeremy was only fourteen years old and that prison is not a good setting for him. The trial court stated that Jeremy would be helped best by a therapeutic environment and that Jeremy would be at risk from other inmates at the penitentiary because of his age. In addition to considering what was in Jeremy's best interest, the trial court considered Jeremy's rehabilitation, the protection of society, deterrence of Jeremy and others, and punishment or retribution. The trial court concluded:

Now, looking at these considerations, I think that the fact of the matter is that the defendant is not an evil person; the defendant is a person who did something evil. And there has to be a punishment component to this sentence.

The psychologists have been very honest with us, I think, very up front with us. They say, well, we don't think that he is any more of a risk to society than any other person would be, but we don't know that. All we do know is that he killed somebody before.

So I think that there has to be a consideration of protection of society from a

person who has demonstrated by his own acts that he kills.

The issue of deterrence, people talk about for years—have talked about for a long time is, does a sentence deter a crime of violence of this type, a senseless crime of this type? And they suggest that it probably will never deter this type of crime. And so I really don't think that deterrence is a factor that is a major consideration.

The last thing is the issue of rehabilitation. I look at that, the question of rehabilitation. I feel that a prison sentence is probably going to do—we're talking just on that issue, the prison sentence is going to more harm than good.

But I just feel that it's so important that this case is—that this type of a crime is so bad there's no excuse for it. That the overwhelming considerations in this case are punishment and protection of society.

The trial court sentenced Jeremy to a life term, with the first fifteen years fixed and the balance indeterminate. The trial court explained this structure of the sentence:

So there will be a portion of this fixed and a portion indeterminate so that the State will be able to, at the end of the fixed portion of the sentence, better determine when it would be in the best interest of society for the defendant to be placed on parole and placed back into society.

I am going to give the State the maximum possible option so that they will have the maximum possible time to make that decision.

Jeremy has appealed the sentence on the grounds that it is unreasonable and constitutes cruel and unusual punishment.

## II.

## THE SENTENCE IS NOT UNREASONABLE.

Jeremy's attorney asserts that the sentence imposed on him by the trial court was unreasonable and should be modified. We disagree.

Before embarking on an analysis of the reasonableness of the sentence, we believe it is important to distinguish our function in reviewing the reasonableness of a sentence from our function in deciding whether a sentence constitutes cruel and unusual punishment. In reviewing the reasonableness of a sentence, we are exercising our authority as an appellate court to determine whether the trial court abused its discretion. *State v. Wolfe*, 99 Idaho 382, 384–85, 582 P.2d 728, 730–31 (1978). In deciding whether a sentence is cruel and unusual, we must decide whether it is proportional. *See* part III, below.

In determining whether a sentence is excessive or is cruel and unusual punishment, we review all the facts and circumstances in the case and focus on whether the trial court abused its discretion in fixing the sentence. *State v. Stormoen*, 103 Idaho 83, 84–85, 645 P.2d 317, 318–19 (1982); *State v. Seifart*, 100 Idaho 321, 323–24, 597 P.2d 44, 46–47 (1979); *Wolfe*, 99 Idaho at 384–85, 582 P.2d at 730–31; *State v. Prince*, 97 Idaho 893, 894, 556 P.2d 369, 370 (1976); *State v. Iverson*, 77 Idaho 103, 111–12, 289 P.2d 603, 607 (1955).

In *Wolfe*, the Court restated the four objectives of criminal punishment: "(1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution for wrong doing." 99 Idaho at 384, 582 P.2d at 730. The Court pointed out: "Appellate review of a sentence is based on an abuse of discretion standard." *Id.* The Court also stated that the general objectives of sentence review are:

(i) to correct the sentence which is excessive in length, having regard to the nature of the offense, the character of the offender, and the protection of the public interest;

(ii) to facilitate the rehabilitation of the offender by affording him an opportunity to assert grievances he may have regarding his sentence;

(iii) to promote respect for law by correcting abuses of the sentencing power and by increasing the fairness of the sentencing process; and

(iv) to promote the development and application of criteria for sentencing which are both rational and just.

99 Idaho at 384, 582 P.2d at 730 (quoting ABA Standards Relating to Appellate Review of Sentences at 7 (Approved Draft 1968)).

In *State v. Dillon*, 100 Idaho 723, 724, 604 P.2d 737, 738 (1979), the Court succinctly stated the standard we must follow in reviewing sentences:

Sentencing is a matter committed to the discretion of the trial judge, and the defendant has the burden of showing a clear abuse thereof on appeal. In exercising that discretion, reasonableness is a fundamental requirement.

(Citations omitted).

Exercising the appellate authority to review the reasonableness of sentences, this Court has on numerous occasions ruled that a sentence was unreasonable or was an abuse of discretion and has ordered the sentence modified. A review of some of these cases is contained in the dissent of Bistline, J. in *State v. Adams*, 99 Idaho 75, 77–79, 577 P.2d 1123, 1125–27 (1978). There are a few others. *See, e.g., State v. Shideler*, 103 Idaho 593, 651 P.2d 527 (1982); *State v. Nice*, 103 Idaho 89, 645 P.2d 323 (1982); *State v. Dunnagan*, 101 Idaho 125, 609 P.2d 657 (1980); *State v. Miller*, 65 Idaho 756, 154 P.2d 147 (1944); *State v. Boyatt*, 59 Idaho 771, 87 P.2d 992 (1939).

Justice Bistline's dissent in *Adams* eloquently stated the prevailing view in the cases where this Court has modified a sentence:

In sum, since its earliest days, this Court has recognized a constitutional and statutory duty to peruse the record conscientiously and to modify the sentence imposed by the trial court whenever justice so requires. In modifying sentences, the Court has given great weight to the age of a defendant, his capacity for strict accountability for his conduct, his status as a first offender or a habitual criminal, his conduct when compared to others similarly charged and the impact of incarceration on the defendant, his family and the community at large.

99 Idaho at 79, 577 P.2d at 1127.

In *Shideler*, the most recent case in which this Court has modified a sentence on the grounds that it was unreasonable, the Court's opinion reflected this "whenever justice requires" standard:

We conclude that the defendant's character and the circumstances surrounding the case are compelling in nature, and sufficiently outweigh the gravity of the crime and the protection of the public interest to require us *in the furtherance of justice* to reduce the sentences of imprisonment from an indeterminate term not to exceed twenty years to an indeterminate term not to exceed twelve years.

103 Idaho at 595, 651 P.2d at 529 (emphasis added).

In his dissent in *Adams*, Justice Bistline also noted that a second line of cases decided by this Court:

manifests a decidedly hands-off approach, puts upon the defendant the affirmative burden of showing a *clear* abuse of trial court discretion and then made that burden impossible to carry by saying that no such abuse will "ordinarily" be found so long as the sentence imposed is within the limits fixed by statute.

99 Idaho at 82, 577 P.2d at 1130.

■ Justice Bistline's concern about the statement that a sentence that is within the limits prescribed by the statute will ordinarily not be found to be unreasonable is well taken. While this statement has frequently been made by this Court and by the Court of Appeals, it really adds nothing to the analysis as to the reasonableness of the sentence. The Court dealt correctly with this subject in *Wolfe* when it said: "The ten year sentence was well within the fifteen-year statutory maximum. Therefore the sentence was not illegal." 99 Idaho at 384, 582 P.2d at 730 (citation omitted). If the sentence is illegal, there is no reason to pursue an analysis as to its reasonableness. If the sentence is not illegal, the defendant has the burden to prove that it is

unreasonable, and thus a clear abuse of discretion.

Since our Court of Appeals was instituted in 1982, most of the sentence reviews have been conducted by that court. In one of the first of these cases, Judge Burnett, writing for the Court of Appeals, explored the meaning of the clear abuse of discretion standard:

A sentence may represent a "clear abuse of discretion" if it is shown to be unreasonable upon the facts of the case. *E.g., State v. Nice,* 103 Idaho 89, 645 P.2d 323 (1982); *State v. Dillon,* 100 Idaho 723, 604 P.2d 737 (1979). This formulation recasts the "clear abuse" standard in positive terms, and enables us to focus upon the ingredients of "reasonableness."

In our view, "reasonableness" implies that a term of confinement should be tailored to the purposes for which the sentence is imposed.

. . . . .

... We hold that a term of confinement is reasonable to the extent it appears necessary, at the time of sentencing, to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case. A sentence of confinement longer than necessary for these purposes is unreasonable.

Such determinations cannot be made with precision. In deference to the discretionary authority vested in Idaho's trial courts, we will not substitute our view for that of a sentencing judge where reasonable minds might differ. An appellant must show that, under any reasonable view of the facts, his sentence was excessive in light of the foregoing criteria.

Before these criteria can be applied ..., we are confronted with the question of how to measure the term of confinement imposed by an indeterminate sentence.

*State v. Toohill,* 103 Idaho 565, 568–69, 650 P.2d 707, 710–11 (Ct.App.1983).

On a few occasions the Court of Appeals has ruled that a sentence was excessive. *See, e.g., State v. Carrasco,* 114 Idaho 348, 757 P.2d 211 (Ct.App.1988), *rev'd on other grounds,* 117 Idaho 295, 787 P.2d 281 (1990); *State v. Eubank,* 114 Idaho 635, 759 P.2d 926 (Ct.App.1988); *State v. Martinez,* 109 Idaho 61, 704 P.2d 965 (Ct.App. 1985), *overruled,* 111 Idaho 281, 723 P.2d 825 (1986); *State v. Martines,* 105 Idaho 841, 673 P.2d 441 (Ct.App.1983). In these cases the Court of Appeals cited the standard developed in *Toohill* and evaluated the excessiveness of the sentence under this standard. In overruling the Court of Appeals' modification of the sentence in *Martinez,* this Court did not refer to the *Toohill* standard. 111 Idaho at 283–84, 723 P.2d at 827–28. The Court specifically disagreed with the statement of the Court of Appeals in *Martinez* concerning the inappropriateness of a fixed life sentence in a case where there was not the intentional and unlawful taking of a victim's life. *Id.* at 284, 723 P.2d at 828.

The essence of the standard Judge Burnett formulated in *Toohill* for determining the reasonableness of a sentence has been adopted by this Court:

Where reasonable minds might differ as to the sufficiency of time of confinement, the discretion vested in the sentencing court in imposing sentence will be respected. *Holmes v. State,* 104 Idaho 312, 658 P.2d 983 (1983). Our task is one of deciding whether a clear abuse of that discretion has been affirmatively shown and the question is whether the sentence is unreasonable upon the facts of the case. To establish that the sentence imposed was improper, the defendant must show that in light of the governing criteria, her sentence was excessive under any reasonable view of the facts. *State v. Toohill,* 103 Idaho 565, 650 P.2d 707 (App.1982).

*State v. Small,* 107 Idaho 504, 505, 690 P.2d 1336, 1337 (1984); *see also State v. Enno,* 119 Idaho 392, 807 P.2d 610, 627 (1991); *State v. Bingham,* 116 Idaho 415, 428, 776 P.2d 424, 437 (1989); *State v. Chapman,* 112 Idaho 1011, 1013, 739 P.2d 310, 312 (1987).

■ Under the *Toohill* standard, it is necessary for us first to determine the term of confinement imposed by the sentence. The Unified Sentencing Act enacted in 1986 requires the trial court to specify a minimum period of confinement—the fixed portion of the sentence—which may be followed by an indeterminate period of custody. I.C. § 19–2513. We have adopted the rule established by the Court of Appeals that the fixed portion of a sentence imposed under the Unified Sentencing Act "is the term of confinement for the purpose of appellate review." *State v. Kysar,* 116 Idaho 992, 999, 783 P.2d 859, 866 (1989) (citing *State v. Maxfield,* 115 Idaho 910, 911, 771 P.2d 928, 929 (Ct.App.1989); *see also State v. Sanchez,* 115 Idaho 776, 777, 769 P.2d 1148, 1149 (Ct.App.1989)).

■ Applying these standards to this case, in order for us to conclude that Jeremy's fixed fifteen-year sentence is unreasonable, we must be convinced that considering (1) the protection of society, (2) deterrence of Jeremy and others, (3) the possibility of Jeremy's rehabilitation, and (4) punishment or retribution for Jeremy, the sentence was excessive under any reasonable view of the facts. As stated by Judge Burnett in *Toohill,* "we will not substitute our view for that of a sentencing judge where reasonable minds might differ." 103 Idaho at 568, 650 P.2d at 710.

Jeremy's attorney asks us to modify the *Toohill* standard in this case to take into account Jeremy's age. Specifically, we are asked to hold that where a child is sentenced as an adult pursuant to I.C. § 16–1806A, we should review the sentence having regard for the needs and best interest of the child and should determine the reasonableness of the sentence in light of those needs and best interest.

In this case, Jeremy was subject to prosecution and sentencing as an adult because he turned fourteen on January 30, 1989. The murder occurred on February 23, 1989, just twenty-four days after Jeremy's fourteenth birthday. I.C. § 16–1806A(1) provides that any person age fourteen to age eighteen who is alleged to have committed any of the crimes enumerated in the statute shall be charged and proceeded against as an adult. I.C. § 16–1806A(3) provides that a person convicted pursuant to this statute may be sentenced as a juvenile in accordance with the juvenile sentencing options set forth in the Youth Rehabilitation Act, as it existed at the time of Jeremy's sentencing in 1989. Under the Youth Rehabilitation Act, as it existed in 1989, the most severe disposition that Jeremy could have received would have been commitment to the legal custody of the Department of Health and Welfare for an indeterminate period of time not to exceed his nineteenth birthday, "unless extended jurisdiction is necessary to complete the rehabilitation goals of the department." I.C. § 16–1814(1)(4) (1989).

In this case, the trial court decided not to sentence Jeremy in accordance with the juvenile sentencing options of the Youth Rehabilitation Act, but to sentence him as an adult pursuant to I.C. § 16–1806A(3). No appeal was taken from that decision, and therefore, we will not address the propriety of Jeremy being sentenced as an adult.

In deciding whether Jeremy should be sentenced as an adult at the sentencing hearing, the trial court considered Jeremy's youth and what was in Jeremy's best interest. This was the appropriate time for the trial court to give special consideration to these factors. After the decision to sentence Jeremy as an adult was made, the fact that Jeremy was only fourteen was one circumstance, along with all the other circumstances the trial court had before it, to be considered in arriving at an appropriate sentence.

In fashioning Jeremy's sentence, the trial court focused heavily on the protection of society. *Toohill* and many of our cases indicate this is appropriate. *E.g., State v. Enno,* 119 Idaho 392, 807 P.2d 610 (1991); *State v. Moore,* 78 Idaho 359, 304 P.2d 1101 (1957). The trial court explained that the purpose of the fifteen-year fixed portion of Jeremy's sentence is "so that the State will be able to, at the end of the fixed portion of the sentence, better determine when it would be in the best interests of society for

[Jeremy] to be placed on parole and placed back in society."

The psychiatrist who testified at the sentencing hearing stated on direct examination that Jeremy did not pose much of a threat to society and that it was extremely unlikely that Jeremy would kill again. The psychiatrist did say, however, that he could not predict that it would not happen again and that Jeremy might do it again, "if the constellation of variables precipitate out again like they did this time." On cross-examination, the psychiatrist testified:

> The fact that he's done it once may actually make him less likely to do it again.
>
> However, I suppose you could also make the case that since he's done it once, he might be more likely to do it again. And I think the only honest answer to that is I don't know.

The psychologist who testified at the sentencing hearing stated on direct examination that he could not reasonably predict whether or not Jeremy would be likely to commit a crime of this nature again. On cross-examination, the psychologist testified that it was possible that Jeremy would be a danger if he were in a position where someone in authority was trying to get him to "toe the line on something" that caused Jeremy to suffer the same kind of stress that existed in his relationship with his father.

In response to this testimony, the trial court said that the experts said they didn't know whether Jeremy was any more of a risk to society than any other person. The trial court concluded: "So I think that there has to be a consideration of protection of society from a person who has demonstrated by his own acts that he kills."

We conclude that reasonable minds might differ as to whether a fifteen-year fixed term, or some lesser fixed term, is necessary to protect society from Jeremy Broadhead. It was a reasonable view of the facts for the trial court to conclude that a fifteen-year fixed term was necessary to protect society. Under these circumstances, we will not substitute our view of the appropriate term of confinement for the view of the trial court.

We conclude that Jeremy's sentence was not unreasonable.

## III.

### THE SENTENCE WAS NOT CRUEL AND UNUSUAL PUNISHMENT.

Jeremy's attorney asserts that the sentence was cruel and unusual punishment in violation of the state and federal constitutions. We disagree.

 A sentence ordinarily will not be regarded as cruel and unusual in violation of art. 1, § 6 of the Idaho Constitution if the sentence is within the limits prescribed by the applicable statute. *King v. State*, 91 Idaho 97, 98, 416 P.2d 44, 45 (1966). To the extent that some of our cases state or imply that a sentence within statutory limits is per se not cruel and unusual punishment, we overrule those cases. *E.g., Watkins v. State*, 101 Idaho 758, 759, 620 P.2d 792, 793 (1980) (construing the eighth amendment); *State v. Prince*, 97 Idaho 893, 894, 556 P.2d 369, 370 (1976); *State v. Chaffin*, 92 Idaho 629, 635, 448 P.2d 243, 249 (1968). As we have pointed out in part II of this opinion concerning the analysis as to the reasonableness of a sentence, the determination that a sentence is within the statutory limits resolves only that the sentence is not illegal. While a sentence within the statutory limits will not ordinarily be regarded as cruel and unusual, this is only the first level of the analysis that must be conducted to determine whether the sentence is cruel and unusual.

The federal courts have followed this same threshold test in reviewing sentences under the cruel and unusual punishments clause of the eighth amendment. Annotation, *Comment Note.—Length of Sentence As Violation of Constitutional Provisions Prohibiting Cruel and Unusual Punishment*, 33 A.L.R.3d 335, 359–63 (1970 & Supp.1990); *U.S. v. Zavala–Serra*, 853 F.2d 1512, 1518 (9th Cir.1988) ("Generally, as long as the sentence imposed upon the defendant does not exceed statutory limits,

we will not overturn it on eighth amendment grounds.").

In this case, Jeremy's sentence was within the limits prescribed by the applicable statute. I.C. § 18–4004 provides: "Every person guilty of murder of the second-degree is punishable by imprisonment not less than ten (10) years and the imprisonment may extend to life." By virtue of I.C. § 19–2513 (the Unified Sentencing Act), the trial court was required to specify a minimum period of confinement for Jeremy and was allowed to specify that the balance of the sentence was indeterminate.

■ The fact that the sentence imposed is within the limits allowed by the applicable statute does not, however, resolve the issue of cruel and unusual punishment. The decisions of both this Court and the United States Supreme Court require that we conduct a further analysis to determine whether the sentence is cruel and unusual. If the sentence imposed by the trial court is within the statutory limit, both this Court and the United States Supreme Court have ruled that we must engage in a proportionality analysis to determine the constitutionality of the sentence.

In exploring the dimensions of the protections afforded by the cruel and unusual punishments clause of art. 1, § 6 of our state constitution, this Court has said:

> Cruel and unusual punishments were originally regarded as referring to such barbarous impositions as pillory, burning at the stake, breaking on the wheel, drawing and quartering, and the like. But it is now generally recognized that imprisonment for such a length of time as to be *out of all proportion to the gravity of the offense committed, and such as to shock the conscience of reasonable [people]*, is cruel and unusual within the meaning of the constitution.

*State v. Evans,* 73 Idaho 50, 57–58, 245 P.2d 788, 792 (1952) (emphasis added).

The United States Supreme Court has also employed a proportionality analysis in reviewing sentences under the cruel and unusual punishments clause of the eighth amendment:

In sum, we hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted. Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals. But no penalty is *per se* constitutional. As the Court noted in *Robinson v. California,* 370 U.S. [660] at 667, [82 S.Ct. 1417 at 1420, 8 L.Ed.2d 758] (1962) a single day in prison may be unconstitutional in some circumstances.

When sentences are reviewed under the Eighth Amendment, courts should be guided by objective factors that our cases have recognized. First, we look to the gravity of the offense and the harshness of the penalty....

Second, it may be helpful to compare the sentences imposed on other criminals in the same jurisdiction. If more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive....

Third, courts may find it useful to compare the sentences imposed for commission of the same crime in other jurisdictions....

In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

*Solem v. Helm,* 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637, 649–50 (1983) (footnotes omitted).

Jeremy's attorney contends that while the sentence in this case might not be cruel and unusual for an adult, a different standard should be applied here because Jeremy was only fourteen at the time of the murder. In support of the adoption of this

special standard, the attorney cites three cases: *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988); *People v. Dillon*, 34 Cal.3d 441, 194 Cal. Rptr. 390, 668 P.2d 697 (1983); and *Naovarath v. State*, 105 Nev. 525, 779 P.2d 944 (1989). These cases do not persuade us that a special standard should be employed in reviewing a sentence imposed on a fourteen-year-old who is prosecuted and sentenced as an adult. We note again, as we did in part II of this opinion, that no challenge has been made in this case to the prosecution and sentencing of Jeremy as an adult pursuant to I.C. § 16–1806A. Therefore, we will not consider the propriety of sentencing Jeremy as an adult.

*Thompson v. Oklahoma* was a death penalty case in which a fifteen-year-old boy was convicted of first-degree murder and sentenced to be executed. The Court's analysis was devoted to an examination of the statutes and practices concerning the execution of children. The specific holding of the case was that "the Eighth and Fourteenth Amendments prohibit the execution of a person who was under 16 years of age at the time of his or her offense." 487 U.S. at 838, 108 S.Ct. at 2700, 101 L.Ed.2d at 720. Having carefully reviewed the reasoning of the Court in *Thompson*, we conclude that it does not provide support for the announcement of a special rule for reviewing penitentiary terms imposed on a person under the age of sixteen. Because of the special scrutiny the Supreme Court has given to the imposition of the death penalty, we doubt that the Court in *Thompson* intended to establish a rule that would affect the usual proportionality analysis set forth in *Solem v. Helm.*

In *People v. Dillon*, the California Supreme Court considered whether a life sentence imposed on a seventeen-year-old who was convicted of first-degree felony murder violated the cruel or unusual punishments provision of the California Constitution. In reviewing the facts of the case, the California court noted that the defendant "was an unusually immature youth." 194 Cal.Rptr. at 419–20, 668 P.2d at 726–27. The court also noted several other circumstances that caused it to rule that the pun-

ishment by a sentence of life imprisonment for a first-degree murderer violated the state constitution. The court ordered the judgment modified by reducing the crime to murder in the second-degree and remanded the case to the trial court to determine whether the defendant should be committed to the Youth Authority. *Id.* at 420, 668 P.2d at 727. The defendant's youth and immaturity were considered along with all the other circumstances in the case. The California court did not create any special rule for determining the proportionality of sentences imposed on children. As we read the lead opinion and those of the concurring justices, the result was dictated more by the California court's consideration of the felony murder rule than it was by the defendant's age.

In *Naovarath v. State*, the Nevada Supreme Court considered a life sentence without the possibility of parole imposed on a boy who was thirteen when he committed a first-degree murder. The Nevada court ruled that this was cruel and unusual punishment under both the state constitution and the eighth amendment. In doing so, the court focused not only on the defendant's youth, but also on the fact that the child was mentally and emotionally disordered. 779 P.2d at 945–46 n. 3, 949. The court ordered the sentence modified to a term of life imprisonment with the possibility of parole. We do not read the opinion of the Nevada court as establishing a categorical rule which prevents a thirteen-year-old, under any circumstances, from being sentenced to imprisonment without the possibility of parole. The court said specifically:

> To say that a thirteen-year-old deserves a fifty or sixty year long sentence, imprisonment until he dies, is a grave judgment indeed if not Draconian. To make the judgment that a thirteen-year-old must be punished with this severity and that he can never be reformed, is the kind of judgment that, if it can be made at all, must be made rarely and only on the surest and soundest of grounds. Looking at the case before us from this perspective, we conclude that the sentence

of life imprisonment without possibility of parole imposed upon Naovarath was cruel and unusual under the Nevada Constitution and the United States Constitution.

*Id.* at 947.

Without imposing a special standard because of Jeremy's age, we are left then to make the proportionality review that both this Court and the federal courts have required when a challenge is made that a sentence is cruel and unusual.

Jeremy's attorney asks us to overturn the sentence fashioned by the trial court on the grounds that it was disproportionate to the crime Jeremy committed under the test stated in *Solem v. Helm.* We are asked to scrutinize the sentence from the perspective of Jeremy's age and lack of maturity. We are also asked to compare Jeremy's sentence with sentences imposed on others in Idaho and other jurisdictions.

As set forth in *State v. Evans,* the standard for determining if a sentence is cruel and unusual under art. 1, § 6 of the Idaho Constitution is whether it is "out of all proportion to the gravity of the offense committed, and such as to shock the conscience of reasonable [people]." 73 Idaho at 58, 245 P.2d at 792. In considering the proportionality of Jeremy's sentence under our state constitution, we have considered the sentence in light of the gravity of the offense and have considered whether the sentence would shock the conscience of reasonable people. To assist us in this analysis, we have reviewed homicide cases appealed to this Court in which youthful offenders were sentenced. We believe it is likely that these are the cases where the most severe sentences have been imposed for crimes similar to the one in this case. Other cases where less severe sentences were imposed are not as likely to have been appealed. *State v. Matthews,* 108 Idaho 453, 700 P.2d 75 (Ct.App.1985) (sentence not appealed).

There is an interesting trio of cases involving youthful defendants convicted of murder after being prosecuted as adults pursuant to I.C. § 16–1806A. Each of these cases was decided by our Court of Appeals. The cases involved the beating death by five youngsters of another youngster with whom they had been incarcerated in jail. *State v. McKeown,* 108 Idaho 452, 700 P.2d 74 (Ct.App.1985); *State v. Matthews,* 108 Idaho at 453, 700 P.2d at 75 (Ct.App.1985) (sentence not appealed); and *State v. Anderson,* 108 Idaho 454, 700 P.2d 76 (Ct.App.1985). The judge who sentenced Anderson considered the homicide to be senseless and brutal. *Id.* at 459, 700 P.2d at 81.

McKeown and Anderson each pled guilty to second-degree murder. McKeown was sentenced to an indeterminate term not to exceed twenty-five years. Anderson was sentenced to an indeterminate term not to exceed twenty-one years. Matthews was convicted by a jury of first-degree murder and sentenced to an indeterminate life term. Since these cases arose in the era before the Unified Sentencing Act, no fixed term was specified by the trial court in any of the three cases. Under I.C. § 20–223, as it existed at the time of the sentencings, McKeown and Anderson were each required to serve at least one-third of their sentences and Matthews was required to serve at least ten years. Automatic good time of ten days for each month served was also available to each of these defendants if they observed all rules and were not subject to punishment. I.C. § 20–101A (1985). This good time provision was amended in 1986 to limit its application to those committed to the board of correction prior to July 1, 1986. 1986 Idaho Sess. Laws, ch. 322, § 1, p. 789. The net effect of these statutes is that, assuming good conduct by each of these defendants, McKeown was required to serve six years before being eligible for parole, Anderson, approximately five years, and Matthews, approximately seven years.

In *State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973), this Court upheld an indeterminate thirty-year sentence imposed on a young man who was eighteen when he killed the two-year-old son of his fiance. Under the parole and good time provisions that governed the case, Beason was re-

quired to serve approximately seven years before becoming eligible for parole.

A fifteen-year-old boy who killed his father and who was prosecuted as an adult appealed to this Court from a ruling that he not be dealt with under the Youth Rehabilitation Act. *State v. Christensen*, 100 Idaho 631, 603 P.2d 586 (1979). The magistrate who had ordered the boy prosecuted as an adult found that the alleged offense was committed in an aggressive, violent and premeditated manner. The boy had two prior offenses for auto theft, including one where a handgun was used, as well as one instance of petty theft. The magistrate found that the protection of the community required isolation of the boy beyond that afforded by the juvenile facilities. *Id.* at 633, 603 P.2d at 588. After this Court upheld the waiver of juvenile jurisdiction, the boy was found guilty of first-degree murder and was sentenced to an indeterminate twenty-year term. *State v. Christensen*, (Case No. 3453, Bonneville County). Under the parole and good time provisions that governed the case, the boy was required to serve approximately five years before he was eligible for parole.

In *State v. Brooks*, 103 Idaho 892, 655 P.2d 99 (Ct.App.1983), our Court of Appeals upheld a twenty-year indeterminate sentence for second-degree murder imposed on a boy who was seventeen when he and some other boys smothered an old man. One of the other boys, who was fifteen, was sentenced to an indeterminate term of thirty years. 103 Idaho at 895, 655 P.2d at 102. Under the parole and good time provisions that governed these cases, the boys were required to serve approximately five and seven years, respectively, before they were eligible for parole.

In *State v. Griffith*, 114 Idaho 95, 753 P.2d 831 (Ct.App.1988), *aff'd on review*, 116 Idaho 173, 774 P.2d 343 (1989), the Court of Appeals and this Court both upheld a fixed fifteen-year sentence for voluntary manslaughter imposed on a young man who was seventeen at the time he participated in the brutal homicide of an individual who was stomped to death. Griffith had a long history of incorrigible

antisocial behavior, had previously been committed to a youth correction facility, had refused to cooperate in a rehabilitation counseling program, had a bad temper, was unable to deal with authority, was a drug user, had no home, lived primarily in the streets, exhibited antisocial behavior and was involved in fights at the jail, and had used alcohol before the homicide. 114 Idaho at 96, 753 P.2d at 832.

In *State v. Enno*, 119 Idaho 392, 807 P.2d 610 (1991), this Court upheld a fixed life sentence for a defendant who was eighteen when he committed the vicious first-degree murder of a woman who taunted him because he would not succumb to her sexual advances. Although in *Enno* the trial court rejected the death penalty in favor of a fixed life sentence, we believe the case is of some significance to our proportionality analysis in this case, because of Enno's youthfulness.

We conclude that Jeremy's sentence is not out of all proportion to the gravity of the offense he committed, nor is the sentence so severe as to shock the conscience of reasonable people. Jeremy laid in wait and killed his father with a rifle. While there were some extenuating personal circumstances involved, the murder can only be described as unprovoked and cruel. Although the fifteen-year fixed portion of the sentence is somewhat disproportionate to the minimum term of confinement in all of the cases we have examined above, except *Griffith*, it is not so disproportionate as to shock our conscience, nor do we believe it would shock the conscience of other reasonable people. Therefore, the sentence is not cruel and unusual under art. 1, § 6 of the Idaho Constitution.

The same basic analysis is appropriate to determine whether Jeremy's sentence violates the eighth amendment. In *Solem v. Helm*, the Supreme Court said:

In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; (iii) the sentences im-

posed for commission of the same crime in other jurisdictions.

463 U.S. at 292, 103 S.Ct. at 3011, 77 L.Ed.2d at 650.

The only additional element to be evaluated in our proportionality analysis under the eighth amendment from that under our own constitutional provision prohibiting cruel and unusual punishments is the proportionality of Jeremy's sentence to sentences imposed for the commission of the same crime in other jurisdictions.

We have reviewed the report of numerous sentences for homicide and other crimes involving violence to others in Annotation, *Comment Note.—Length of Sentence as Violation of Constitutional Provisions Prohibiting Cruel and Unusual Punishment*, 33 A.L.R.3d 335 (1970 & Supp.1990). The cases reported in this source cause us to conclude that while there are sentences in similar cases that have been imposed in other jurisdictions that were less severe than the fifteen-year fixed term imposed on Jeremy, there are some that were more severe. For instance, in *Rogers v. State*, 257 Ark. 144, 515 S.W.2d 79 (1974), *cert. denied, Rogers v. Arkansas*, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975), a seventeen-year-old first offender was sentenced to life imprisonment without an opportunity for parole for first-degree rape.

We also note that in one of the cases cited by Jeremy's attorney, *Naovarath v. State*, 779 P.2d at 944, the Nevada Supreme Court modified the sentence of a thirteen-year-old who had murdered a man. The original sentence was life imprisonment without the possibility of parole. The modified sentence was life imprisonment with the possibility of parole. The Nevada law specified that the child was required to serve at least ten years of this sentence. *Id.* at 952 n. 7.

We conclude that Jeremy's sentence is not so disproportionate under the analysis specified in *Solem v. Helm* as to be cruel

and unusual punishment under the eighth amendment.

## IV.

## CONCLUSION.

We affirm the sentence imposed on Jeremy by the trial court.

BAKES, C.J., (concurs in Parts I & II, concurs in result in Part III), BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, dissenting.

## PART I.

The sentencing of Jeremy Broadhead should have brought to the minds of those present the teachings of Paul, Romans, Ch. 12, verse 19: "Dearly beloved, avenge not yourselves, but *rather* give place unto wrath for it is written, Vengeance is mine; I will repay, saith the Lord." As is readily seen, vengeance was the foremost and pervasive element in the sentence which the district judge fashioned for Jeremy Broadhead, and in addition to vengeance there must be included the judge's obvious distaste for patricide, even though there is no such crime as patricide. The word patricide is not found in the Idaho Criminal Code. It is not found in American Jurisprudence, nor is it found in Corpus Juris Secundum. It is not found, per se, in the sentence which was imposed upon Jeremy. But it is implicitly found in the court's sentencing remarks wherein the court concluded that this particular homicide was a violation of the Biblical commandment "Honor thy father;" self-evident from the court's view that killing one's father was not just another first degree murder, but a "terrible thing" and in the same breath an "incredible thing with *absolutely no mitigation* for what he did."

After expressing condolences to Jeremy's mother, and to members of the Broadhead family,[1] the Judge opened his sentenc-

---

1. Persons present and identifiable as the Broadhead family included Claire Broadhead, brother of the deceased; Kay Mickelson, a sister of the deceased; and Brandon Broadhead, Jeremy's only sibling, six years older. The parents of Claire Broadhead and Kay Mickelson may have been present. Their hostility to Jeremy was

ing remarks, the culmination of which would be imposition of the sentence which he surely had already reached. Those remarks clearly reflected what direction the sentencing would take:

> Miss Estep, I'm sorry for you. I know this is a terrible thing that's gone through your life.
>
> And Mr. Broadhead and the members of the Broadhead family, I'm twice as sorry for you, because it's—this is an incredible thing.
>
> The Bible says, 'Honor they father and mother.' See what happens when the—that simple injunction is violated, and here we are today.

The inference readily drawn from those remarks is that although patricide is not a crime per se, but any unlawful killing of another is a crime, the Judge considered patricide as a crime more terrible than murder. Immediately following those remarks, the Judge proceeded toward handing down the decision as to whether Jeremy should be sentenced as a minor or as an adult. Four factors were laid out which the Judge saw as making "adult sentencing *inappropriate.*"

> First of all, the very fact that the defendant is 14 years old, *that he is a child;*
>
> Second that's been brought out, and I don't know if anybody really questions it, is *that prison is not a good setting for a 14-year-old;*
>
> Third, *that the defendant would be best helped by a therapeutic environment;* and
>
> Fourth, something that's been unsaid but, I think, something that's recognized in all of our minds, is that the defendant would be at risk from other inmates at the penitentiary because of his age.

(Emphasis added.) On the other side of that ledger the Judge gave faint recognition to only one factor: "that the penitentiary has procedures in place and *would do*

*its best* to protect the defendant from that risk."

There followed a short digression concerning "what is in the best interests of Jeremy Broadhead." Having asked himself that question, the Judge failed to answer it, and to this very day it remains unanswered. Instead the Judge diverted himself with a meaningless hypothetical question and answer: "And if this were a case where Jeremy was 14 years old and had stolen his dad's car and he was before me on that, that [14 years of age] would be the factor that I ought to consider, but that's not what he's here for." Jeremy Broadhead had previously pleaded guilty to the crime of second degree murder.[2]

The Judge then paused to state the reason for Jeremy's presence in court:

> Jeremy Broadhead is here because he committed an act of murder. And under the laws of this state he is treated as an adult and is sentenced as an adult for that crime, *unless I specifically find that adult sentencing is inappropriate.*

(Emphasis added.) To that point in time the Judge had not at all delved into any analysis or explanation as to what he concluded would be in Jeremy's best interest, other than the above remarks made while pondering over the decision whether to treat Jeremy as the child which he was, or as an adult who had perpetrated a terrible and incredible murder. There is nothing in the record which discloses the Judge's view as to what could and would be in the best interests of Jeremy Broadhead. Additionally, to that same point in time, the Judge had not yet declared himself as intending to allow Jeremy to be proceeded against as a child, or as an adult. Having not done so, he did not do so, and no reasons or reasoning were provided to show a reviewing court the basis for sentencing 14-year-old Jeremy as though he were an adult. This is very noticeable, because the court itself had previously enumerated four reasons which militated against adult sentencing.

---

well documented in a letter which was furnished to the presentence investigator.

**2.** The charge of the complaint initially laid was first degree murder. Prior to the day set for sentencing, a second amended information was filed, charging second degree murder.

And so it was, as a matter of continuity, that immediately after observing that Jeremy was not in court on a charge of stealing his dad's car, the Judge went on to say, as one aspect pertinent to "any adult sentencing situation," which included rehabilitation [3]:

> This court, after all, if you go back in history, *is here for one purpose*, and that is ultimately that when Jeremy killed his father, that his father's brother did not come and kill him. *That's one of the purposes of this court, is vengeance, is society's vengeance, society's punishment....*

(Emphasis added.) [4]

With, and even without, due regard for the disciple Paul's admonition, but with due regard for the law, the proposition that *vengeance* belongs to the court as the executor of community consensus is not acceptable. Deterrence is proper and a permissible component in sentencing, but vengeance and deterrence are neither synonymous nor interchangeable. The purpose of deterrence, as an element in sentencing, is to send a message to those who might contemplate committing crimes, the threat of which message is that it is better to forget such notions or be prepared to go to prison.

That murder in Idaho has become over-rampant is not questioned. One need only compare the statistics of the past twenty years to the statistics of the twenty years which preceded the last twenty. All murders, whether or not constituting a patricide, are terrible and incredible. The United States Supreme Court in *Godfrey v. Georgia*, 446 U.S. 420, 428–29, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398, stated, "A person of ordinary sensibility could fairly characterize almost every murder as outrageously or wantonly vile, horrible and inhuman." When one reads of exacting vengeance, one is reminded of committees of vigilantes, who in the early days of the West took the law into their own hands, and dispensed justice as they envisioned it.

Vengeance clearly appeared to be the keystone of both of the Judge's decisions, the first of which was to sentence the fourteen year old as though he were an adult; the second was to confine him in prison for a full fifteen years before he would be allowed to request any leniency, provided, however, only if he had developed into a responsible person. This latter condition was attached notwithstanding the fact that Jeremy would be for fifteen years deprived of a "therapeutic environment." His environment would be just the opposite, one of both repression and depression.

Having come out strongly for vengeance the Judge proceeded to justify his decisions. First provided was the suggestion above set forth which seemed to imply that if the court failed to exact vengeance, the deceased father's brother might to do. Continuing on,

> Now, looking at all of those factors, I come to the conclusion that *although it might be in Jeremy's best interests that he be sentenced as a youth under the YRA*, that it nevertheless is entirely appropriate that he be sentenced as an adult because of these other factors, because of the *terrible thing* that he did. It was such *a bad crime, it was such a horrible crime that he can't be treated as a child.*
>
> There is absolutely no mitigation for what he did. I suppose, perhaps, in the subjective sense, *in looking at it through Jeremy's eyes, he did it for the reasons that were explained very ably by the psychologists and the psychiatrist.*
>
> But looking at it objectively, there was no reason for this crime. If ever this was a case where the crime had a victim, this is the case where there was a victim.

---

3. Also mentioned, but certainly not a composite part of a child's best interests, were the "protection of society; ... the question of general deterrence to other people who might be in a similar situation; and also specific deterrence to Jeremy himself." The Judge also mentioned proportional sentencing and punishment.

4. Nothing in the record provides any light as to why the Judge made a remark suggesting that Jeremy's uncle, Claire Broadhead, the victim's brother, might be contemplating vengeance against Jeremy for having killed his brother.

I don't know what the victim would say to me if he could talk to me. I suppose he probably would say, it's my son.

But you have to be punished, Jeremy.

....

Now, looking at these circumstances, I think that the fact of the matter is that the defendant's not an evil person; the defendant is a person who did something evil. And there has to be a punishment component to this sentence.

The psychologists have been very honest with us, I think, very up front with us. They say, well, we don't think that he is any more of a risk to society than any other person would be, but *we* [5] don't know that. All we do know is that he has killed somebody before.

So I think that there has to be a consideration of protection of society from a person who has demonstrated by his own acts that he kills.

The issue of deterrence, people talk about for years—have talked about for a long time is, does a sentence deter a crime of violence of this type, a senseless crime of this type? And they suggest that it probably will never deter this type of crime. And so I really don't think that deterrence is a factor that's a major consideration.

The last thing is the issue of rehabilitation.

(Emphasis added.)

At this stage of the sentencing, although the Judge had virtually ruled out deterrence as a factor of major consideration, never discounted or ruled out was vengeance as constituting the purpose of courts. Next examined was the possibility of giving consideration to rehabilitation:

I look at that, the question of rehabilitation. I feel that a prison sentence is probably going to do—we're talking just on that issue, *the prison sentence is going to do more harm than good.*

But *I just feel* that it's so important that this case is—*that this type of a crime* is so bad there's no excuse for it. That *the overwhelming considerations in this case are punishment and protection of society.*

Now, the—Mr. Flanagan has suggested an alternative of imposing a prison sentence but leaving the way open after time at St. Anthony's, and perhaps a 180-day—120-day rider, the court retain jurisdiction to consider some other alternative.

So what are we talking about there, practically speaking? We're talking about sometime between six months from now and two or three years from now the court being asked to reconsider the sentence.

Well, I think I'd be putting a false hope in Jeremy's mind to say that I'm going to change the sentence at that time. I don't think that that's a reasonable alternative because I, again, go back to the same thing, *that this is too terrible a crime.*

*I don't anticipate that I would put Jeremy on probation ever,* so I don't think that—I am not going to consider that alternative.

(Emphasis added.) Then the Judge delivered the sentence: "I am imposing a life sentence. I am going to make the first 15 years of the sentence fixed. The balance of the sentence will be indeterminate."

The transcript of that hearing is convincing that the Judge's sentence was based on the perception that judges are the manifestation of all society, and perhaps as well the messenger of a Divine Providence. The conclusion inexorably drawn is that the Judge truly believed that it was his obligation, as the spokesman representing society and the bereaved family, to inflict a sentence on Jeremy which exacted a full measure of vengeance. This is understandable. The Judge was overwhelmed by the magnitude of this murder and greatly ag-

---

**5.** In stating *"we* don't think that he is any more of a risk to society than any other person would be ...,"* the Judge was, as the preceding sentence shows, restating the testimony of the psychologists. The additional statement, "but *we* don't know that. All we do know is that he has killed somebody before,"* was the Judge's response and apparently *"we"* meant the Judge and the people who comprise society.

itated by implications of it being an incredible patricide. Having just heard the impassioned eulogy of the deceased delivered by Claire Broadhead, the Judge's state of mind entitled him to recuse himself from further participation; another district judge could have stepped in. In dealing out vengeance the Judge was unmindful that vengeance truly belongs to the Lord. To the court belongs the responsibility to impose a sentence which is consonant with a defendant's fault, but which does not include the exacting of vengeance.

This sentencing bears a remarkable similarity to the sentencing of James O. Bakker. *United States v. Bakker*, 925 F.2d 728 (4th Cir.1991). When one keeps well in mind the Judge's clear focus on exacting vengeance, and his apparent contempt for the crime of patricide being committed in the society or community of present times, it follows as does day follow night that "the court's own sense of religious propriety had somehow been betrayed." *Bakker*, 925 F.2d 741. As was done in *Bakker*, at the very least the sentence should be vacated and the cause remanded to the district court for resentencing by another district judge. There is also no lack of precedent which allows that this Court, with the collegial input of five members, can modify the sentence and thus put an end to further proceedings. *State v. Ledbetter*, 83 Idaho 451, 364 P.2d 171 (1961); *State v. Shideler*, 103 Idaho 593, 651 P.2d 527 (1982).

## PART II.

The Court has decided to uphold the indeterminate life sentence imposed on fourteen year old Jeremy Broadhead, fifteen years of which he must serve before any possibility of parole. Jeremy was only twenty-six days beyond his fourteenth birthday when his father was killed by gunshot wounds inflicted by Jeremy. Counsel for Jeremy in a well prepared brief has carefully explained the circumstances

attendant to this tragedy, but all to no avail, first in the trial court and now in this Court. Because it accurately and succinctly gives an account of the sentencing, it is in order to provide to the readers those passages of counsel's brief which are critical to a proper understanding of the circumstances which existed on February 24, 1989: [6]

> At the time of his arrest, Jeremy Broadhead had just turned 14 years of age, having reached 14 only 26 days before, on January 30, 1989. At such time, Jeremy was an eighth grader at the Meridian Middle School. Prior to the arrest in this case, Jeremy had never been arrested or had any personal exposure to the criminal justice system.

> Subsequent to his arrest, Jeremy Broadhead stated to the Ada County law enforcement officers that he shot his father.

> . . . .

> On October 11 and 12 of 1989, a sentencing hearing was held before the Honorable George D. Carey. The defense presented a number of witnesses.

> Kathy Clarkson, Appellant's seventh grade Spanish teacher, testified that Jeremy was an average student. However, during the middle of February, some two weeks prior to the murder, Jeremy's grades began to fall drastically. Furthermore, she testified that Jeremy was well liked and well adjusted at school.

> John R. Crespin [assistant wrestling coach at Meridian Middle School] testified that Jeremy was an excellent athlete and had gone undefeated during the 1988 and 1989 wrestling season. Furthermore, he indicated that Jeremy was an extremely coachable athlete and contributed a great deal more than wins to the team by continually assisting others in their wrestling endeavors.

**6.** Submission to the reader of part of the content of counsel's brief is not to be taken as an intimation that there are any deficiencies in Justice Johnson's portrayal of the underlying facts, and presentation of the applicable statutory law and case law, including recent some-

what similar cases, one from Nevada, one from California, and a third from the United States Supreme Court which was issued following review of an Oklahoma state court sentence which imposed the death penalty.

Judy Estep, Jeremy's mother, testified that she [and] John Steven Broadhead had two children, Brandon and Jeremy Broadhead. Furthermore, she indicated that during the time she was married to the deceased, they lived between 13 and 15 different locations. On May 26, 1982, Ms. Estep was divorced from the deceased [and] was awarded custody of Brandon and Jeremy Broadhead and moved to Pocatello, Idaho.

In November of 1986, [she] married Kenneth L. Estep and moved to Arbon Valley, Idaho. She testified that her new husband and she often had arguments over Jeremy.

In June of 1988, Jeremy, then 13 years of age, moved to Boise to reside with [his father]. On October 14, 1988, Jeremy took [his father's] pickup and drove it to American Falls. Ms. Estep and Brandon found Jeremy, who appeared to be very upset. At that time, Jeremy was told he would return ... to Boise [and live with his father].

Three mental health experts, ... testified relative to Jeremy's mental condition preceding, during, and subsequent to the death of John Steven Broadhead.

Kathryne Beck testified that she was a psychiatric social worker in private practice. Furthermore, she stated that she had seen Jeremy twice, and had reviewed the police reports in preparation for her testimony.

Ms. Beck stated that she believed the Defendant felt trapped. She also stated that it was not her opinion that Jeremy was a 'cold-blooded murderer.' Ms. Beck stated Jeremy was seeking relief for himself and was living in emotional isolation.

It was also her opinion that Jeremy did not understand the consequences of his acts, and that the Youth Service Center, located at St. Anthony, would be the most appropriate form of incarceration for Jeremy.

Craig Beaver testified he was a psychologist with a Ph.D., who had seen Jeremy twice, reviewed the police reports, and spoke with Dr. Estess in preparation for testifying. He indicated that the results of his testing demonstrated that Jeremy did not exhibit a violent profile, and furthermore, the testing revealed that Jeremy's perceptions were quite inaccurate.

Dr. Beaver testified that it was his opinion that Jeremy was not emotionally a 14–year old and that his emotions were that of a person of a younger age. He also stated that a correlation existed between Jeremy's testing results and the testing results of an individual that ultimately commits suicide.

Although Dr. Beaver did not definitively say that Jeremy would not commit another murder, he did state that the murder was very much tied to the family dynamics and Jeremy's childhood.

Finally, Dr. Beaver stated that he would recommend a sentence for Jeremy which encompassed a therapeutic environment, as well as substantial peer support.

Michael Estess, a psychiatrist, testified that he had seen Jeremy on at least a half dozen occasions, and had reviewed the police reports as well as conducted numerous interviews with other individuals involved in the case prior to his testifying.

He stated that Jeremy was immature for his age. It was his opinion that when Jeremy killed his father, Jeremy thought more in child-like terms than he did in adult terms.

Dr. Estess described the murder as a tragedy and a desperate attempt by Jeremy to give release to his internal ruminations, as well as to solve his problems. He felt Jeremy's ability to understand the nature of his acts was impaired by his uselessness, depression, and emotional turmoil.

Furthermore, Dr. Estess stated that it was his opinion that a correlation existed between Jeremy's mental state and that of an individual who ultimately commits suicide.

Dr. Estess did not feel that Jeremy presented a threat to society. He recommended, in regard to incarceration, that Jeremy be held in an environment that nurtured adolescence, such as the Youth

Service Center. He specifically stated that any incarceration *should be at a facility other than the Idaho State Correctional Institute.*

*The State did not call any witnesses or present any evidence to rebut the testimony of the Defendant's three mental-health experts.*

George Miller, the Deputy Warden of Operations for the Department of Corrections in Idaho, testified to the conditions under which the Defendant would be imprisoned should he be sentenced to the Idaho State Correctional Institute. He indicated that Jeremy would be placed in protective custody ... [meaning] that Jeremy would eat alone in his cell, and exercise for one hour each day alone.

Although Jeremy would be able to receive his G.E.D. through a correspondence course, a teacher would not be present, and he would not be allowed to utilize the education building.

Daily, Jeremy's only contact would be with a correction officer. Monthly, Jeremy would have contact with at least one mental-health worker, and one nurse ... [and] He ... [might] have contact with a religious coordinator, depending upon the number of volunteers.

Mr. Miller testified that he would be allowed two, three-hour visits each week with his immediate family.

Finally, he stated that the youngest prisoner ever housed at the Idaho State Correctional Institute was 16 years of age.

Curt Friedenauer, the director of the Idaho State Youth Service Center, testified that, after reviewing the presentence investigation, which had been provided to him through a court order, it was his opinion Jeremy was an appropriate candidate for the Youth Service Center.

He indicated that the Youth Service Center encompassed programs which were peer oriented through a group process. Furthermore, he indicated that, daily, Jeremy would receive, at a minimum, one and one-half hours of counseling. He stated that schooling was available five days a week, 8:30 a.m. to 3:00 p.m., and that the Youth Service Center had available five separate vocational programs.

Appellant's Brief, 1–6 (emphasis added).

The trial judge was not persuaded by the testimony of the psychiatric social worker, the psychiatrist, the psychologist, the Department of Corrections Deputy Warden and the director of the Idaho State Youth Service Center. Their testimony, collectively, did not include a vengeance factor. They did not contend that some measure of punishment was not in order. While Jeremy had committed a murder, those witnesses were firmly of the belief that Jeremy was a good candidate for therapeutic treatment as to be much preferred over imprisonment. Although the Judge also entertained the view that Jeremy would be "at risk" in being confined as an adult, he nevertheless decided in favor of confinement, not just being locked up, but the equivalent of solitary confinement. Rather than allow himself to succumb to the twin voices of reason and compassion, the trial judge elected to deposit Jeremy in the Idaho State Correctional Institute for no less than fifteen years.

The rationale displayed in this Court's opinion, that the sentence is not unreasonable, is entirely unconvincing: "It was a reasonable view of the facts for the trial court to conclude that a fifteen year fixed term was necessary to protect society." At 147, 814 P.2d at 407. The district court judge's attempts to support the sentencing rationale, undoubtedly sincere, are nevertheless not persuasive. First, there is the tendered explanation that the purpose of the fixed fifteen years is "so that the State will be able to, at the end of the fixed portion of the sentence [fifteen years], better determine when it would be in the best interests of society for Jeremy to be placed on parole and placed back in society." This may be semantically appealing at first blush, but what if after Jeremy has been closely confined for fifteen years in prison it is concluded that the best interests of society would have been better served by accepting the advice of educated and

trained experts in the field, and placing Jeremy at once on probation and pursuing rehabilitation? The prison isn't going to disappear, so if Jeremy's probation and/or rehabilitation were to prove unsuccessful, those iron doors could still swing open to receive him. To cage a fourteen year old like an animal can hardly be condoned as being in a child's best interests, a possibility which may not have occurred to the Judge. Sentencing did not have to be imposed immediately following the taking of testimony and argument of counsel. A wiser course would have been for the court to defer its pronouncement so as to make a more considered determination.

A second reason advanced in purported support of the severe sentence, as the majority points out, was that "there has to be a consideration of protection of society from a person who has demonstrated by his own acts that he kills." Frankly, this statement itself is overkill put to an indefensible usage. To say that a person *"kills"* is to say that the person habitually kills, that the person kills often. Absent any discussion or analysis as to why Jeremy killed, not just a person, but his father, it defies reason and logic to label him as a youth who "kills." Jeremy killed but one person. The district judge seemed to be basing his extraordinary sentence on his belief, perhaps only a hunch, that because Jeremy took the life of his own father, he was destined to become an habitual killer, perhaps even a serial killer. Not a scintilla of expert testimony was introduced which would intimate that this child, if unrestrained, would be a threat to society as a whole. To the contrary, the expertise of the psychiatrist and the psychologist established a then-present truthful inability to make a guaranteed prediction whether Jeremy would or would not be likely to murder some other person. Their best judgment was that he would not. The State on the other hand, had presented no expert testimony whatever to the effect that Jeremy would be likely to do so. In the Court's view the positive testimony weighed against the negative goes for naught, and the Court *sub silentio* endorses the overstated view of the sentencing court, "Jere-

my Broadhead kills." Little or no attention was directed by the trial court, and in turn this Court to the fact that Jeremy has been shown to have killed one person, and, as a singularly notable fact, that one person was his father. Entirely missing is any evidence that, but for this one incident, Jeremy was given to *any* acts of violence. Yet he was labelled by the district court as a boy who kills. The trial judge's illogical reasons for imposing the harsh sentence make clear that the sentence was not based on "a reasonable view of the facts." Alternatives in sentencing were rejected out-of-hand; best interests of a fourteen year old were disregarded.

The majority also rejects Jeremy's assertion that the sentence was cruel and unusual punishment. Again, the rationale behind that rejection is unconvincing. It consists of a discussion of three cases where special treatment was given to youthful offenders sentenced as adults because of their tender years. *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988); *People v. Dillon*, 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697 (1983); *Naovarath v. State*, 105 Nev. 525, 779 P.2d 944 (1989). Despite the special treatment, the majority decides that these cases give no support to a special standard for youthful offenders on sentence review.

Second, the majority compares Jeremy's sentence to sentences in other Idaho cases where a young person committed a murder. In all of these cases (except for *State v. Enno*, 119 Idaho 392, 807 P.2d 610 (1991), which involved an 18–year–old), the defendants received less severe sentences even though they were older than Jeremy and some of them had prior criminal records. Nevertheless, the majority concludes that the sentence was not out of proportion to the offense committed. One can only ask, why bother to compare sentences at all if, after finding that the sentence at issue is more severe than in comparable cases, the conclusion is nevertheless that the sentence is not out of proportion?

Justice Johnson in authoring today's opinion for the Court has provided a generally fair and dispassionate collection of the

facts, circumstances, and certainly applicable case law. Particularly appreciated is the incorporation into the Court's opinion an excerpt of that which I wrote in *State v. Adams*, 99 Idaho 75, 577 P.2d 1123 (1978), "In modifying sentence, the Court has given great weight to the age of a defendant, his capacity for strict accountability for his conduct, his status as a first offender or a habitual criminal, his conduct when compared to others similarly charged, and the impact of incarceration on the defendant, his family, and the community at large." Those factors add up to five in number. Each and every one is important, and deserving of discussion as applied to the Jeremy Broadhead sentence. Applying those factors to what we have before us, the better course to take would be a modification of the sentence, for reasons heretofore alluded to in Part I hereof. Being fully aware that this Court, as presently constituted, has yet to make its first modification of a trial court's sentence, it is in order to remember the philosophy of this Court as evidenced less than ten years ago.

This is readily available in *State v. Shideler*, 103 Idaho 593, 651 P.2d 527 (1982), cited by Justice Johnson at 144, 814 P.2d 404. *Shideler*, was a unanimous opinion authored by Justice McFadden, in which this Court did not act precipitately, but with due deliberation. Shideler, as is so with Jeremy Broadhead, did not put the State to the expense of a trial. Although he too faced multiple charges arising out of his involvement in an armed robbery, the weapon being a shotgun, he entered a guilty plea. That weapon was fired at a vehicle which pursued him and his accomplice following the bank robbery. The district court sent him to prison to serve an indeterminate twenty-year term. Shideler, although fully mature as contrasted to Jeremy's fourteen years, "could not recall having any motive for the crime" and added "that for at least a year prior to the robbery and up to the time of the robbery, that he was in poor mental health." Unlike Jeremy, Shideler was experiencing marital problems with his second wife. Unlike Jeremy, who was constantly confined for ap-

proximately nine months while being processed, Shideler had been released on bond at one period. His family and his employer "all agreed further that Shideler was not a hardened criminal." In Jeremy's case, as was so in Shideler's, it was a first felony for each. In Shideler's case, unlike Jeremy's, there was a considerable abuse of prescription drugs, Quaalude, Valium, Empirin 3's and 4's, Darvon, and Darvoset–N–100.

This Court's unanimous opinion observed that:

> This was the defendant's first felony with no prior history of any criminal activity and this court has 'recognized that the first offender should be accorded more lenient treatment than the habitual criminal.' *State v. Owen* 73 Idaho 394, 402, 253 P.2d 203, 207 (1953) (overruled on other grounds). Besides this being his first felony, the record discloses that the defendant has accepted responsibility for his acts, and that his family and employer have shown considerable interest in his future. We conclude that the defendant's character and the circumstances surrounding the case are compelling in nature, and sufficiently outweigh the gravity of the crime and the protection of the public interest to require us in the furtherance of justice to reduce the sentence of imprisonment from an indeterminate term not to exceed twenty years to an indeterminate term not to exceed twelve years. *State v. Nice*, 103 Idaho 89, 90, 645 P.2d 323, 324 (1982). *See State v. Dunnagan*, 101 Idaho 125, 609 P.2d 657 (1980).

*Shideler*, 103 Idaho at 595, 651 P.2d at 529. What the Court did in *Shideler* it can and should do here in Jeremy's case. The plight of a fourteen year old lad being sent off to prison presents an even far more compelling circumstance than did *Shideler*, where this same Supreme Court took cognizance of the defendant's character and age as weighed against the gravity of the crime and the protection of public interest to require that in the furtherance of justice the sentence be appropriately reduced.

## PART III.

At one point in the delivery of the sentence being imposed, the Judge stated, "If ever there was a case where the crime had a victim, this is the case where there was a victim." But, in reality, when all of the background of this case is considered, who was the victim? Steve Broadhead was the slain person, but the real and greater victim is Jeremy. The son lives on to endure a life which many will consider to be worse than death. To so say is not to preach, which is not our function as judges, any more than it is for us to make the calls and decisions which are properly those made by persons who have become experts in chosen fields, in this case psychologists, psychiatrists, and also those persons who have dedicated themselves to the service of youth. The sorriest aspect of this tragedy lies in becoming aware that although the history developed post-mortem is overwhelming that the relationship of father and son had deteriorated and was daily continuing to worsen, something that the experts who were called in post-mortem could have foreseeably predicted, but the experts were not called. Although there is an abundance of information in the record and transcript, nor is there any mention that either Jeremy's father, mother, stepfather, grandparents, uncle, aunt, or anyone had ever suggested that Jeremy was entitled to and desperately in need of professional counseling. Apparently there was *none.*[7] As the Judge remarked, "and here we are today."

Clearly, Jeremy was a product of not just a broken home, but of a broken family. No one who has worked himself through the voluminous presentence report will challenge that assertion. The one positive in Jeremy's life, where family and family relationships are concerned, is the strong bond of love which existed between Jeremy and Brandon, his brother who was six years Jeremy's senior. Notwithstanding that age difference, in connection with the divorce of their parents, Brandon displayed an exceptionally astute assessment of where that divorce and their mother's second marriage left them:

Q. How would you describe your relationship with Jeremy?

A. He is my brother, you know, I love him. He is my brother. I don't know, me and my brother have always been real close. You know, out of all of the family, *me and him were always right there.*

. . . .

Q. Did you speak with him about why he had come over from Boise to American Falls, and taken Steve's pickup?

A. Right during that time?

Q. Or anytime had you spoken with him about it?

A. No, not really. You know, those things just didn't matter, you know. I mean, it didn't matter where we were going, really. Do you know what I am saying? I mean, it was just, I don't know, the way I looked at it, *it was just me and him anyways.*

Q. What do you mean by that, Brandon?

A. What?

Q. That it was just you and Jeremy?

A. I don't know. It was like that's all it was, *it was just me and Jer*, you know. In my mind, maybe I am wrong; I don't know.

Q. Explain to the court what you mean. Expound on that a little bit.

A. Well, you know, our parents had gotten a divorce; that was kind of difficult to handle. I mean, it wasn't, but it was. And, you know, *Jer and I were always together even after splitting us apart*, you know, trying to get us to go this way or this way, and *me and Jer were still there together.* You know, *we were there for each other all the time.*

. . . .

Q. Did he talk about the problems he was having with Steve?

---

7. It is noted that the prosecuting attorney in giving closing argument made the statement that Steve Broadhead got counselling for Jeremy and obtained tutoring for him. Tr. 281. But the prosecutor provided no elaboration as to from whom, how often, how long, or of what the tutoring consisted. Moreover, final argument is *not* testimony.

A. It was nothing major. It was like, you know, just things that, I don't know, it is hard to explain. He just wasn't relating, you know.

Q. What do you mean by that?

A. God. They just—I don't know. I don't know what I mean exactly, I mean, I do, but it is hard to explain.

Q. Attempt to.

A. Well, you know, I mean, it was like—I don't know. It was just minor things like they would just, I don't know, *neither one of them, nobody really understood what we were going through* it seemed like to me.

Q. Excuse me, understood what?

A. What we were going through.

Q. You and Jeremy?

A. Yeah. We were just trying to get through and get by. I mean, this is not even relating to what you are asking me. It is getting kind of far off base.

Q. I guess, Brandon, did you have problems with Steve?

A. Oh, kind of, not really. I mean, you know, he was my dad.

Q. How would you describe your relationship with him?

A. Oh, it was good, but it was light. We kept fairly light conversations. It seemed like we never really got real deep. He was never really into what I was thinking, and I was never really understanding what he was thinking, you know. It was like I would go spend a weekend, we would go do things, keep the conversation really light, and then I would go home. I mean, we weren't, you know.

. . . .

Q. In regard to Jeremy, is there anything you can tell the court that you think would assist the court in sentencing Jeremy?

A. As far as what I think they should do?

Q. Just as far as Jeremy and why Jeremy did what he did.

A. I don't know. We were both just, Jeremy—this is Jeremy, he just kept everything inside so much. You know, he was like, I don't know.

Q. Did he have problems expressing his feelings?

A. Oh, yeah, definitely. We both did. Maybe we both still do; I don't know. I mean, yeah, I have always learned to keep my feelings inside, you know.

Q. Is Jeremy that way?

A. Yeah. More so than me, I would say.

The marriage of Judy to Steven Broadhead was in December of 1966 and lasted to May of 1982. A first separation was almost four years before Jeremy was born. During the existence of the marriage the family changed locations between thirteen to fifteen times. The 1982 divorce resulted in Judy having custody of the two boys; they moved from Boise to Pocatello. Steve was lavish in purchasing gifts for the children, including motorbikes, at a time when Jeremy was only seven years old. A new relationship, which came about when Judy married Ken Estep, a bachelor with no experience with children, was unfortunate. The new father figure was a disciplinarian of the old school variety, and there were as many arguments between Judy and Ken as to rearing Jeremy as there had been when Steve was the father figure. The new family relationship became worse in volume and intensity, plus there were arguments worsened by Ken Estep's drinking habits. That relationship ended when Steve called directly to Jeremy and requested that he come to Boise when summer vacation started. Judy agreed that Jeremy could go for the weekend, but Steve did not return him. Judy acquiesced, although retaining legal custody, she allowed Jeremy to stay with Steve in Boise.

## CONCLUSION

Had the Judge at sentencing been evenly concerned as to Jeremy's best interests as he was with vengeance, a far less severe sentence could have been imposed, and justice would just as well have been served. The testimony of the expert witnesses should have been the light leading the way to the correct path. The Judge listened to the expert witnesses; he was well aware of

their credentials, their lack of bias, and their desire to be of aid to the Court when the Judge would perform his function; but more important than all that, one thing which the transcript teaches us is that the Judge believed them to be credible witnesses. That was exemplified in his own remarks.

Where mentioning only psychologists, it is abundantly clear that the Judge had in mind psychiatric expertise as well, and he went on to tell those assembled in the courtroom, "The psychologists [plural] have been very honest with us, I think, very up front with us." Earlier he had conceded that when Jeremy shot his father, "he did it for the reasons that were explained very ably by the psychologists and the psychiatrist." It cannot be said otherwise that those remarks constituted the Judge's assessment of that expert testimony—credible—and so found specifically by the further observation that he found those witnesses to be "very honest" and "very up front" in their explanation as to Jeremy's mental processes in coming to the conclusion that putting his father away was the only avenue of escape. But, the remaining question is, having heard and accepted that expert testimony, did the Judge use it? The answer, all too plainly, is that he did not. The Judge synopsized that evidence 100 percent correctly: "They say, well, we don't think that he is any more of a risk to society than any other person would be."

That in turn begs the question: Is the Judge, who is the personification of the Court, at liberty to reject expert testimony coming from the mouths of witnesses, whom he has adjudged to be "up front" and "very honest with us"? There is in Idaho an ingrained rule which applies to the circumstances under discussion. Called the *Pierstorff* rule or *Pierstorff* doctrine, it is as stated by the Chief Justice in *Systems Associates, Inc. v. Motorola Communications & Electronics, Inc.*, 116 Idaho 615, 621, 778 P.2d 737, 743 (1989): "An adjudicatory body may not 'arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes known to the law, if such testimony does not exceed probability.' *Pierstorff v. Gray's Auto Body Shop*, 58 Idaho 438, 447–48, 74 P.2d 171, 175 (1937)." The Chief Justice in *Systems Associates* went on to add, as is equally so here, "Here the trial court, as the finder of fact, accepted the truth of the unrefuted statements by Dahmer and defendants.... *Swanson v. State*, 114 Idaho 607, 759 P.2d 898 (1988); *Pierstorff v. Gray's Auto Body Shop*, 58 Idaho 438, 74 P.2d 171 (1937)." 116 Idaho at 621, 778 P.2d at 743.

The principle of law announced first in *Pierstorff* has been cited to and applied for over half a century. No valid reason can be advanced why the *Pierstorff* rule is not applicable here to the testimony of expert witnesses who were not only unimpeached, but whose credibility was vouched for by the Court itself. Our case law precedent upholding the *Pierstorff* rule is voluminous. Equally so are the reported cases where the Court has held the trial court in error for not recognizing the *Pierstorff* rule. Here we can do no less, and that error provides an additional ground for reversing the sentence imposed. Again I would suggest that the sentencing judge not be made to subject himself to endure the agony of another sentencing.

The legal conclusion which is ultimately and necessarily drawn is that the Judge was not at liberty to disregard the credible, unimpeached, and unrefuted testimony of the psychologists and psychiatrists that Jeremy Broadhead would be no more of a future threat to society than any other person. While the Judge could have said, "We don't know that," he could not ignore it when it was the only evidence presented on that issue.